**UNIVERSAL OIL PRODUCTS CO. v. CAMPBELL (UNITED STATES, intervenor) (two cases).**

Nos. 9902–9905.

United States Court of Appeals Seventh Circuit.

April 6, 1950.

452

Ralph S. Harris, William W. Owens, New York City, Adam M. Byrd, Chicago, Ill., Lee J. Gary, Chicago, Ill., Loren C. Berry, H. Allen Lochner, New York City, of counsel, for Universal Oil Products Co.

Theron Lamar Caudle, Assistant Attorney General, Ellis N. Slack, Frank J.

Ready, Ruppert Bingham, George R. Parsons, Special Assistants to the Attorney General, Otto Kerner, Jr., United States Attorney, John A. Looby, Jr., Assistant United States Attorney, Chicago, Ill., for Nigel D. Campbell and the United States.

Before DUFFY, LINDLEY and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

These are appeals by the defendant, the former Collector of Internal Revenue for the First District of Illinois, and the intervenor, the United States of America, from judgments of the District Court in numbers 9902, 9903 and 9904 on appeal, and an appeal by the plaintiff, Universal Oil Products Company, from a portion of the judgment in number 9905 on appeal.

The plaintiff brought three actions to recover a total of $1,576,808.42 of income and excess profits taxes, which it had paid on the income it reported for the years 1944 to 1946, inclusive, on the ground that it had been a tax exempt corporation under § 101(6) of the Internal Revenue Code, 26 U.S.C.A. § 101(6), from and after November 29, 1944. The intervenor, United States of America, in these three actions sought to recover from the plaintiff a total of $1,582,886.29 on alleged tax deficiencies for the three years.

The three cases were consolidated for trial in the Court below and, by order of this Court, were consolidated here for the purpose of briefing and argument.

In these appeals the parties have presented six principal questions for our consideration:

1. Whether the plaintiff is exempt from income and excess profits taxes as a scientific and educational corporation under § 101(6) of the Internal Revenue Code from and after November 29, 1944, on which date all of its capital stock and notes were acquired by a trust which was admittedly exempt from taxes on its income under said section?

2. Did the plaintiff, which used the accrual basis for its accounting and for reporting income and deductions, earn income in the year 1945 in the amount of $1,035,205.50 under its agreement with the Tide Water Associated Oil Company, or did it earn only one-fourth of that amount in each of the years 1945 and 1946?

3. Was the plaintiff entitled under § 23 (a) of the Internal Revenue Code, 26 U.S. C.A. § 23(a) to deduct in the years of 1942-1946, inclusive, certain expenditures made by it in connection with the prosecution of an action by Universal Oil Products Company of South Dakota against the Skelly Oil Company?

4. Did the plaintiff realize income of $75,000 in 1942 by the receipt from a debtor, on the Kanotex settlement, of one of its notes having a face value of $75,000 when the note at that time had a market value of only $60,000?

5. Was the plaintiff in the 1944 tax case entitled under § 23(a) of the Internal Revenue Code to a deduction of $356,867.47 for unpaid royalties owed by Root Refining Company which the plaintiff released in July, 1944?

6. Should overpayments of taxes which were credited under § 3806 of the Internal Revenue Code, 26 U.S.C.A. § 3806, in part payment of claims of the United States against plaintiff growing out of re-negotiations of excess profits under plaintiff's war contracts for the years 1944 and 1945 be taken into account in computing any refunds allowable to the plaintiff or tax deficiencies collectible from the plaintiff for these two tax years?

We shall consider these questions in the above order.

Exemption under Section 101(6).

The principal question presented by these appeals is the question of whether the plaintiff taxpayer from and after November 29, 1944, was, as the District Court held, exempt under the provisions of § 101(6).

The basic facts concerning this question are not in dispute. The plaintiff taxpayer was organized in 1932 as a Delaware business corporation with its principal place of business in Chicago, Illinois. Upon its organization the plaintiff succeeded to the bulk of the business and took over most of the assets and liabilities of a South Dakota

454

corporation of the same name, hereinafter referred to as "South Dakota".

In 1931 South Dakota was a party to, or was defending on behalf of its licensees, many suits for infringement and was engaged in more than one hundred pending patent interference and opposition proceedings. As a part of the settlement of all this litigation the stock of South Dakota was indirectly acquired by several of the major oil companies through a series of reorganizations which resulted in the organization of the plaintiff and in the acquisition of its stock and other securities by these major oil companies.

The plaintiff's charter, like that of South Dakota, authorized it to engage in research work in chemistry, engineering, and other scientific fields; to acquire, own and license patented processes; to render engineering and other services; and to design chemical plants. The plaintiff at all times here in question was, and now is, engaged in the business of conducting research in the field of chemistry and physio-chemistry, particularly in the crude oil field; of devising processes, particularly those having to do with the crude oil field; of reducing such processes to commercial uses; of obtaining patents for such processes; of designing refineries and parts thereof to refine crude oil; and of licensing its patents and processes to others engaged in the refining of crude oil. The main objective of the plaintiff is to develop and acquire processes on units that can be used by the refining industry. It attempts to obtain patents covering such processes so that it can have a monopoly on the processes in connection with its business as an architect engineer for petroleum refineries. The plaintiff also manufactures and sells certain chemicals called catalysts and inhibitors to refineries. Plaintiff's revenue producing customers are principally small and independent refiners who do not have adequate research and engineering facilities to keep abreast of the major oil companies.

The capitalization of the plaintiff, since 1934, has consisted of 250,000 shares of non-voting A stock, 100 shares of voting C stock and 100 shares of voting S stock, all classes of the par value of $1 per share.

As of October, 1944, all of the above was issued and outstanding with the exception of 130,000 shares of A stock. Plaintiff also had outstanding in 1944 C and D income "Notes" in the aggregate principal amount of $8,500,000; and prior to November, 1949 also had outstanding A "Notes" payable only from net income. No dividends have ever been paid on any of this stock since the recapitalization of the company in December, 1934, but prior thereto it paid dividends of a little more than $1,000,000 per year on its stock.

Prior to October 26, 1944, all of the outstanding shares of common stock and the outstanding income notes of the taxpayer were owned by the following oil companies:

Shell Oil Company, Inc.

Standard Oil Company of California

Standard Oil Company (Indiana)

Standard Oil Company (New Jersey)

The Texas Company

Phillips Petroleum Company, hereinafter referred to as "Phillips"

N. V. deBataafsche Petroleum Maatschappij.

On October 26, 1944, all of the owners of the stock and notes of the plaintiff, except Phillips, entered into a trust agreement creating the Petroleum Research Fund, and transferring to the Guaranty Trust Company of New York as trustee all of their stock and notes of the plaintiff as the corpus of said trust fund. This agreement provided that said trust should continue in perpetuity and that the recipient of funds distributed by the trustee should use such funds "exclusively" for advanced scientific education and fundamental research in the "petroleum field", which might include any field of pure science which in the judgment of the recipient might afford a basis for subsequent research directly connected with the "petroleum field". The agreement also provided that comprehensive reports of the research carried on by the recipient should be made available at least once each year to the public at large; that copies of such reports should be made available by the recipient to the donors of the trust; and that all publications of the results of such re-

search should give credit to the donors of the trust.

The trust agreement then provided that the recipient or beneficiary of the trust fund should be the American Chemical Society, or a qualified successor.

The trust agreement stated that the plaintiff was a corporation engaged in the business of research and development work in the petroleum field, the ownership and licensing of processes, patents, and patent rights relating to the petroleum field; that the donors believed that the carrying on of such business was in the public welfare; and that, unless and until it should be authorized by a court of competent jurisdiction, the trustees should not sell or otherwise dispose of any of the securities of the plaintiff, nor should they *"cause or permit the plaintiff to discontinue research and development work in the petroleum field, and the ownership and licensing of processes, patents and patent rights relating to the petroleum field."* (Emphasis supplied.)

The trust agreement also provided that the donors, by the execution and delivery of the agreement, completely surrendered all interest in, and rights of supervision of any kind whatsoever over, the trust fund and should not be deemed to have any rights by way of reverter or otherwise.

Thereafter, Phillips transferred all of its stock and notes in the plaintiff corporation to the American Chemical Society which in turn transferred said securities on November 29, 1944, to Guaranty Trust Company of New York as Trustee for the Petroleum Research Fund subject to the provisions of the trust agreement, which the other owners of plaintiff had executed October 26, 1944.

The operations of plaintiff are carried on in its engineering office in Chicago and in its laboratories near Riverside, Illinois. An important part of its work at the Riverside laboratories is in research and development. It employs about 275 persons at this plant, of which approximately 70 are engaged in research and development work.

In each of the years 1944 through 1946, inclusive, the plaintiff owned more than 2,000 patents, had 600 to 1,000 patent applications pending and was granted during the three years 382 United States patents and 142 foreign patents. During the years here in question the taxpayer expended the following amounts in the operation of its Riverside plant and of its patent departments: 1944, $1,111,410.27; 1945, $1,175,-636.70; 1946, $1,369,763.97, a larger amount each year, and a total of $3,656,810.84 for the three years.

Through contracts entered into during the period from 1931 to and including 1939 the above named major oil companies, which had owned all the stock and notes of plaintiff, and their subsidiaries had acquired the right to use, without payment of royalties, all of the patents of the plaintiff based on inventions made by the plaintiff prior to July 1, 1947, and, as to Phillips, on inventions made prior to August 14, 1956. Some of these contracts expressly gave the transferees a license for the use of the patents while others guaranteed immunity from action for infringement of the patents. This resulted in the fact that during the years here in question these companies and their subsidiaries, constituting approximately 65% of the oil refining capacity of the United States, had the right to use, and did use, royalty free the inventions under the patents owned by the taxpayer in those years; and they would continue to have the right to such free use on inventions made by the plaintiff prior to July 1, 1947, and, in the case of Phillips, made prior to August 14, 1956. Such right to the free use of such patents ordinarily extends for the life of the patents.

The amounts which the smaller independent oil companies were paying for licenses for the use of such of these patents as they were using are shown by the following table:

| Year | Gross Income of Plaintiff | Royalties Income of Plaintiff |
|---|---|---|
| 1944 | $7,167,281.41 | $4,553,495.71 |
| 1945 | 6,070,432.51 | 4,125,922.92 |
| 1946 | 4,582,783.88 | 3,351,029.49 |
| Total | $18,820,497.80 | $12,030,448.12 |

The net income of the plaintiff as shown by its tax returns for the years 1944, 1945 and 1946 was as follows:

| Year | Net Income |
|------|-----------:|
| 1944 | $3,710,727.74 |
| 1945 | 2,727,326.27 |
| 1946 | 901,529.60 |

A total for the three years of $7,339,583.61

Of this net income the plaintiff paid nothing to the trustee during the year 1944 or the year 1945. In 1946 it paid to the trustee as interest on plaintiff's C and D notes a total of $258,962.49. Of this amount the trustee paid to itself as fees for its services $100,000, and other expenses totaling $11,638.45, leaving as a total for the American Chemical Society, the recipient, the sum of $147,325.04 for its share of the earnings of the taxpayer for the years here in question.

There was testimony to the effect that in the judgment of the board of directors of plaintiff it was necessary to set up a reserve because of certain pending law suits and because of the need for enlarging and modernizing its laboratory and research facilities; that some of the larger oil companies had been spending large amounts of money for new laboratories and equipment; and that it was necessary to the welfare of the taxpayer to set up reserves for such purpose because it could not procure first class scientists without proper laboratory facilities.

At the time the stock and notes of the plaintiff taxpayer were transferred to Guaranty Trust Company of New York as trustee, the certificate of incorporation of the taxpayer in Article 8(6)(a) provided that the majority of the board of directors was expressly authorized and empowered without the assent or vote of the stockholders to make, alter, amend and repeal the by-laws of this corporation in any manner not inconsistent with the provisions of the certificate of incorporation. Under paragraph (d) of the same Article and Section they were authorized to determine and direct the use and disposition of the annual net profits of this corporation or of its net assets in excess of its capital, and in particular to determine whether any, and if any, what part of the profits or excess assets should be declared in dividends and paid to the stockholders. By Section 9 of Article 8 the directors were empowered and authorized by a resolution of the board, and without any action by the stockholders, to authorize the corporation at any time to issue and sell any shares of its capital stock out of the unissued shares authorized.

A year after the creation of the trust its certificate of incorporation was amended by adding a Tenth Article thereto, which was as follows: "Tenth: This corporation is organized and shall be operated exclusively for charitable, scientific or educational purposes. No person shall hold or own any stock or securities representing any proprietary interest in this corporation and no person shall have any right in or claim to any share of the earnings or profits of this corporation except a corporation, trust, fund, foundation or community chest organized and operated exclusively for charitable, scientific or educational purposes. No part of the net earnings of this corporation shall inure to the benefit of any private shareholder or individual. Distribution of net earnings shall inure only to such corporation, trust, fund, foundation or community chest organized and operated exclusively for such charitable, educational or scientific purposes. No substantial part of the activities of this corporation shall be carrying on propaganda, or otherwise attempting to influence legislation. *Nothing herein contained shall be deemed to prevent this corporation, subject to the qualifications aforesaid, from continuing to be operated as a stock and business corporation for profit."* (Emphasis supplied.)

It is significant to note that when this amendment was made the provisions as to the powers of the corporation and as to the powers of the directors were left in the certificate of incorporation as they had originally been written.

Prior to the amendment of the certificate of incorporation, the taxpayer's by-laws, which had been the usual by-laws for a business corporation for profit, were amended to provide that each director, oth-

er than one who was at the time a salaried officer of the corporation, should receive a fee of $500 for attendance at each meeting of the board of directors, not exceeding a total of $5,000 in any one calendar year, and should also be paid all expenses incurred 'by his attendance at such meetings.

It is admitted by the Government that the Petroleum Research Fund and the American Chemical Society are both tax exempt. There was undisputed evidence to the effect that since November, 1944, none of the directors of taxpayer elected by the trustee has had any connection with any of the oil company donors; that none of the directors, officers or employees of the taxpayer has any legal or equitable interest in the stock or securities of the taxpayer; and that the management of Universal since 1944 has been entirely separate and distinct from its management prior to November 30, 1944.

The plaintiff insists that under the above facts it is a tax exempt corporation under § 101 (6) of the Internal Revenue Act, 26 U.S.C.A. § 101 (6), which exempts corporations which are: " * * * organized and operated exclusively for * * * scientific * * * or educational purposes * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation".

This section provides four requirements which a corporation must meet to qualify for exemption: First, it must be organized exclusively for scientific or educational purposes. Second, it must be operated exclusively for scientific or educational purposes. Third, no part of its net earnings shall inure to the benefit of any private shareholder or individual. Fourth, no substantial part of its activities shall consist of carrying on propaganda or otherwise attempting to influence legislation.

The plaintiff insists that since all of its stock and notes were transferred to the Guaranty Trust Company, trustee, to become the corpus of the Petroleum Research Fund, admittedly a tax exempt fund; and

since all net earnings which were paid to the trustee were to be distributed, after the payment of the expenses of the trust, to the American Chemical Society, also admittedly tax exempt; the taxpayer thereby also became a tax exempt organization under § 101 (6).

After carefully considering the record and the evidence in this case we are convinced that the plaintiff failed to bring itself within the exemption provided by § 101 (6).

 It is true that ordinarily in the construction of a statute levying a tax, doubts should be resolved against the Government, but in construing an exemption provision of such a statute a strict construction in favor of the Government should be made. Equitable tax statutes should tax equally. An exemption is in derogation of the common right. When the law provides an exemption the courts should not construe the provisions beyond the exact and express requirements of the language used. Yazoo & Mississippi Valley Railroad Company v. Thomas, 132 U.S. 174, 10 S.Ct. 68, 33 L.Ed. 302; A. Schrader's Son, Inc., v. United States, 2 Cir., 51 F.2d 1038; see, Sun-Herald Corporation v. Duggan, 2 Cir., 73 F.2d 298, 300.

Some of the decisions have stated that exemption provisions in favor of charitable, educational and scientific organizations should be liberally construed on the theory that the exemption of the income of such organizations is for the public good and their exemption is according to public policy dictated by Congress. For a corporation to qualify for the benefit of such policy of liberal construction, however, it must first bring itself within the reasons for the policy by proving that it is an organization of the type to which the reasons apply, i. e., as to § 101 (6), that it was "organized and operated exclusively" for one or more of the exempt purposes. Certainly it was not the intent of Congress to grant an exemption to any corporation which was not of the exempted type.

To bring itself within the exemption the plaintiff relies on a line of cases stemming from a statement of Mr. Justice Van De-

vanter in Trinidad v. Sagrada Orden, 263 U.S. 578, 44 S.Ct. 204, 205, 68 L.Ed. 458. The Supreme Court in holding that the taxpayer there was exempt from taxation as a corporation "organized and operated exclusively for religious, charitable, scientific or educational purposes * * *", made the statement, 263 U.S. at page 581, 44 S.Ct. at page 205, that: "Two matters apparent on the face of the clause go far toward settling its meaning. First, it recognizes that a corporation may be organized and operated exclusively for religious, charitable, scientific or educational purposes, and yet have a net income. Next, it says nothing about the source of the income, but makes the destination the ultimate test of exemption."

The corporation there was the legal representative of an ancient religious order; the members took the vow of poverty; it had no stockholders; and all of its income was applied to religious, charitable and educational purposes. The bulk of its income consisted of rents, dividends and interest. Less than three per cent of its total income consisted of profits on the sale of wine, chocolate and other articles which it purchased and sold to, and for use in, its churches, missions, parsonages, schools and other subordinate agencies. The Government conceded that the taxpayer was organized and operated for religious, charitable and educational purposes and that no part of its net income inured to the benefit of any stockholder or individual, but insisted that the taxpayer's commercial activities, i. e., its small trade in wine, chocolate and other articles, constituted an operation for business and commercial purposes which prevented it from being operated exclusively for religious and charitable purposes. The Court, however, said, 263 U.S. at page 582, 44 S.Ct. at page 206: "As respects the transactions in wine, chocolate and other articles, we think they do not amount to engaging in trade in any proper sense of the term. It is not claimed that there is any selling to the public or in competition with others. The articles are merely bought and supplied for use within the plaintiff's own organization and agencies—some of them for strictly religious use, and the others for uses which are purely incidental to the work which the plaintiff is carrying on. That the transactions yield some profit is in the circumstances a negligible factor. Financial gain is not the end to which they are directed."

The cases cited by plaintiff stress the single statement of the Court in the Trinidad case that the destination of the income and not its source was the ultimate test of exemption. We must bear in mind, however, that there the Court was only considering whether an inconsequential portion of the income of the taxpayer derived from sales to its own members and agencies prevented it from being operated *exclusively* for charitable and educational purposes. The primary purpose of the organization and operation of the taxpayer was not in question.

The Trinidad case was decided in 1924. In 1926 the United States Board of Tax Appeals in Unity School of Christianity, 4 B.T.A. 61, decided that the Unity School of Christianity was exempt from taxation under a similar provision of the applicable Internal Revenue Act. The taxpayer there was incorporated for the purpose of establishing and maintaining a school for instruction in the promotion of Christianity and related subjects. Again, there was no question but that the taxpayer was *organized* for exempt purposes; and on the basis of the Trinidad decision the Board held that its publication and sale of books and the operation of a cafeteria, library and unity center were all operations for religious, charitable and educational purposes. The Tax Board significantly said in discussing the Trinidad case, 4 B.T.A. at page 67: "It is apparent that the Court regarded the general purpose and the primary functions and activities of the organization as the principal matters to be considered. That is to say, a corporation failing in the primary attribute of being a religious, charitable, scientific or educational organization requires no further consideration, for it is in no event within the exempting provision. If it be not one of this class, it is unnecessary to consider the remaining qual-

ifications prescribed by the statute, since they are only restrictions upon corporations of the principal character exempted."

In Sand Springs Home v. Commissioner, 6 B.T.A. 198, the Board of Tax Appeals determined that the taxpayer, a corporation organized under the laws of the state of Oklahoma "for the purpose of forming a benevolent, eleemosynary corporation under the laws of the state of Oklahoma was exempt from taxation." There again it was admitted that the purpose of the *organization* of the taxpayer was charitable. The Board on the authority of the Trinidad and Unity School of Christianity decisions held that the activities of the taxpayer were all in furtherance of its charitable purposes and that it was, therefore, also operated exclusively for charitable purposes and was exempt.

Hanover Improvement Society v. Gagne, 1 Cir., 92 F.2d 888, cited by plaintiff, decided that the taxpayer, organized under the laws of New Hampshire with articles of association which stated that its sole purpose was the improvement and betterment of the Village and its facilities and services for the common benefit of all the people, was an exempt corporation under § 101 (8) of the Internal Revenue Code. The Court found that the taxpayer was an organization not organized for profit and operated exclusively for the promotion of social welfare, even though as a part of its activities it operated a motion picture theatre in Hanover which constituted the association's principal source of income which was used for carrying out its purposes. Here again the Court was considering only the operation of a taxpayer admittedly organized for an exempt purpose.

The case on which plaintiff most strongly relies is Roche's Beach, Inc., v. Commissioner, 2 Cir., 96 F.2d 776. The Court stated that the corporate taxpayer there, "* * * was organized by Edward Roche shortly before his death for the purpose of being the medium through which a charitable foundation created by his will could operate his property and collect the income therefrom after his death."

The taxpayer was formed as a business corporation under the laws of New York.

Upon its formation Roche conveyed to it real estate along the Atlantic Ocean, his bathing beach, including buildings and equipment, which he was then operating, and a claim against the City of New York for property taken by condemnation. On the same day he executed a will in which he bequeathed to his testamentary trustees all of the stock of the corporation for the purpose of establishing a relief foundation, an admittedly charitable foundation within the meaning of § 103(6) of the Revenue Act of 1928, 26 U.S.C.A. § 101(6). Roche then continued to personally operate the property for approximately four months until he died. After his death the property and business was operated by the trustees through the medium of the corporation. The Court there stated that the statute did not mean that to come within the exemption a corporation may not conduct business activities for profit; and that the destination of the income is more significant than its source, citing the Trinidad, Sand Springs Home and Unity School of Christianity decisions. The Board of Tax Appeals had denied exemption on the theory that "the stated purposes for which a corporation is organized must be found in its charter." The Court said, "We think this is too narrow a view," and cited the Unity School of Christianity decision as being in point.

While it is true that the Unity School of Christianity was actually incorporated under the business corporation law of Missouri, its stated purposes, as well as extrinsic evidence, showed that the actual purpose of organizing the corporation was religious and educational. In the Roche's Beach case the Court stated that it had intimated an opposite view in Sun-Herald Corporation v. Duggan, 2 Cir., 73 F.2d 298, where it had said that "organized" meant "incorporated". But, the Court continued, 96 F.2d at page 778: "The decision in the Duggan case (first Sun-Herald case) was correct, for the real issue was whether a *subsequently formed purpose* to hold the property of a business corporation for an exempt institution to which all its stock had been given entitled it to exemption under § 103(14) ; but the dicta on the mean-

ing of the word 'organized' are broader than we care to adhere to." (Emphasis supplied.)

This language plainly indicates that the Court in the Roche's Beach case was still of the opinion that at the time of the organization of a corporation it must have been the intention of the organizers or incorporators to organize it for exclusively charitable or other exempt purposes; and that no one could organize a business corporation for the purpose of profit and later make it exempt under § 101(6) by the simple expedient of transferring its ownership to an exempt organization. In Sun-Herald Corporation v. Duggan, supra, referred to as being a correct decision, the Sun-Herald Corporation was organized as a business corporation for profit under New York law, to conduct a general newspaper publishing business which was later sold to the New York Tribune, Inc. for notes in the principal sum of $3,150,000. Thereafter, the Sun-Herald Corporation, all its stock having been transferred to an exempt corporation, had as its sole business the holding of said notes, the collection of interest thereon and the payment of the interest to the exempt parent organization. The Court held that it was not a tax exempt corporation under § 103(14) of the 1928 Revenue Act, even after all of its stock had been transferred to an admittedly exempt corporation.

In a second Sun-Herald case, Sun-Herald Corporation v. Duggan, 2 Cir., 160 F.2d 475, the same Court explained its decision in the Roche's Beach case by saying, 160 F.2d at page 476, that the modification in Roche's Beach of what they had said in the earlier Sun-Herald case "was no more than to hold that the certificate of incorporation was not the only test of whether a corporation was 'organized'" for an exempt purpose.

In Commissioner v. Battle Creek, Inc., 5 Cir., 126 F.2d 405, the taxpayer was organized under the general corporation laws of Florida but the charter provided that the general nature of the business was to teach the theory and practice of biologic living as developed and exemplified at the Battle Creek Sanitarium under the direction of Dr. John Harvey Kellogg, to care for and treat the sick and to so train and educate the sick, and the well, as to prevent disease and disability and promote efficiency and longevity. Under this charter the Sanitarium maintained a regular schedule of rates which were charged to patients who were able to pay while others who were unable to pay full rates paid nothing or a fraction of the regular charge. The Court held that the fact that the charter of the taxpayer actually authorized it to engage in other lawful business, under which authority the taxpayer had never operated, did not prevent its being exempt under § 101(6) of the Revenue Act of 1934, citing Unity School of Christianity and Roche's Beach.

Bohemian Gymnastic Association Sokol of City of New York v. Higgins, 2 Cir., 147 F.2d 774, and Debs Memorial Radio Fund v. Commissioner of Internal Revenue, 2 Cir., 148 F.2d 948 were both cases cited by plaintiff where taxpayers, organized for admittedly exempt purposes were found to still be exempt although they conducted certain activities which produced a net income used in carrying out the purposes of their organization.

In Commissioner of Internal Revenue v. Orton, 6 Cir., 173 F.2d 483, 486, the Court held that upon the stipulated facts in that case there was a rational basis for the conclusion of the Tax Court that the foundation there in question was organized and operated for the predominant purpose of producing industrial, scientific and social betterments without any personal or private gain to any one. The foundation was established by the will of Orton who had long been interested in and had been a manufacturer of pyrometric cones for use in the ceramic industry. The foundation was without members or stockholders, and its activities were directed by trustees who received only nominal compensation for their services. Orton's will stated that it was his intention to provide an organization not for profit but "whose real or ultimate objects are altruistic and [wholly] devoted to producing industrial, scientific and social betterments without any personal or private gain [to any one]. * * *" He considered the business which he bequeathed to the foundation as the source

of income for the promotion of research and studies in that field. The Court there pointed out that business does not operate without being related to some objective; that with the ordinary business man it is run for profit and the profits serve his needs; that the foundation there in question produced profits to be "plowed back into the furtherance of research and study in that field"; and that the foundation could therefore be considered as having been operated for educational or scientific purposes. The Court leaned heavily on the Trinidad and the Roche's Beach cases. There the taxpayer was not a business corporation organized and operated for profit and then later turned over to an exempt parent organization. We do not consider that case as authority for the questions confronting us.

When these cases, on which plaintiff depends, are carefully read and considered in connection with the factual situation involved in each, we find that none of them supports the plaintiff in its claim for exemption as a corporation *organized* exclusively for scientific or educational purposes.

In our opinion the plaintiff taxpayer was not organized exclusively for scientific or educational purposes within the meaning of § 101(6). Its original incorporation in 1932 under the laws of Delaware was as an ordinary business corporation for profit. It was incorporated to carry on the same type of business activities in which South Dakota had been engaged. Its organization was one of the steps which was taken to aid in bringing to an end the vexatious and expensive litigation in which some of the major oil companies were then engaged. The only science which its incorporators then had in mind was the scientific research for the sake of better business and more profits for the major oil companies which were responsible for its organization. Within the period from the date of its organization to November 29, 1944, plaintiff paid from its profits to the owners of its stock and notes a total of $14,291,-471.29. As to *its original organization* in 1932, there can be no doubt that plaintiff was organized for the purpose of business for profit.

But, plaintiff contends, when all of its stock and notes were, on November 29, 1944, transferred to Guaranty Trust Company as trustee for the Petroleum Research Fund "it was irrevocably dedicated to scientific and educational purposes. Its entire character taxwise changed. From that date, all its net earnings were dedicated and destined exclusively to exempt uses." With this reasoning we cannot agree. To reach this conclusion one must say that if the net earnings of any business corporation organized for profit are dedicated to an exempt purpose we may then say that the corporation was organized exclusively for that purpose. None of the cases cited by plaintiff goes that far. To so hold we must ignore the clear language of the Act. Such a holding would be carrying too far the Trinidad statement as to the importance of the destination of the income and would seem to be in conflict with the intent of Congress as expressed in 26 U.S.C.A. § 23 (q) of the Internal Revenue Code, which limits the allowable deductions by corporations for such donations to 5 per cent of net income. If we assume, arguendo, that the dedication of the net earnings of a business corporation to an exempt purpose constitutes operation of the corporation for that purpose, it still does *not follow that* the corporation was organized for that purpose.

Rules of construction require us, if possible, to give some meaning to the word "organized" in addition to the meaning of the word "operated". As said by Judge Hand in Sun-Herald Corporation v. Duggan, supra, 2 Cir., 73 F.2d 298, in discussing the meaning of the word "organized" as used in another paragraph, (14), of the same section of the Act, page 300: "We think it clear that 'organized' means incorporated and not 'operated.' * * * The use of the word 'operated' in addition to the word 'organized' * * * indicates that 'organized' was not * * * to have the meaning of 'operated' but further to interpret the exemption."

Here as in the second Sun-Herald Case, 2 Cir., 160 F.2d 475, 476, we may say: "In the case at bar, no matter how broadly one views the evidence, these plaintiffs were

not 'organized' for the purpose of aiding any educational purpose."

The Court there added, "True, by 1930 they had ceased to have any other activity than to hold property for a municipal art museum; but that will not serve."

Plaintiff cites no case which holds that "organized" as used in § 101(6) may be interpreted as having the same meaning as "operated".

Actually, the transfer of the stock and securities of the plaintiff to the trustee did not change the type, character or purpose of the organization of the plaintiff. It was still a business corporation organized for profit. The only change was in the ownership of its stock and notes and the consequent change in the recipient of such part of its net earnings as the directors might see fit to distribute. If we were to follow plaintiff's reasoning and agree that plaintiff under the facts of this case became exempt November 30, 1944, there would be one other interesting result of this transfer. For the period in which plaintiff was paying to the Trustee for the Petroleum Research Fund the total sum of $258,962.49 it would secure the refund of income taxes it had paid for the same period in the total sum of $1,573,079.31.

After this transfer the plaintiff's board of directors, under the provisions of its certificate of incorporation and its by-laws, still had the power to say what, if any, part of its earnings would be distributed, and what part would be plowed back into its business of research, development and acquisition of patents. The board also had the power, under the certificate of incorporation, and without any action by the stockholders, to issue and sell the authorized, but still unissued, 130,000 shares of its Class A capital stock.

On November 15, 1945, a year after the date from which it claims exemption, the plaintiff amended its certificate of incorporation by adding a new Article Tenth. This new Article used the language of § 101 (6) to describe the purpose of its organization and its operation, and to meet the other requirements of the section. It also included a provision that no person should own any stock or securities representing a proprietary interest in plaintiff. Mr. Harris, the president of plaintiff, in the exemption affidavit filed in 1946, explained that the purpose of this amendment was "by way of adding additional legal sanction to the fact that Universal has, since November 29, 1944, been organized and operated exclusively for charitable, scientific and educational purposes * * *."

However, none of the other articles of incorporation was changed and this Article Tenth concluded with this significant sentence: "Nothing herein contained shall be deemed to prevent this corporation, subject to the qualifications aforesaid, from continuing to be operated as a stock and business corporation for profit."

It seems to us that this amendment of its certificate of incorporation can only be considered as a belated attempt by plaintiff to bring itself within the form for exemption under § 101(6) while still retaining its original corporate power and purpose to operate in the same manner as it had since its original organization, that is, as a business corporation for profit.

In the Roche's Beach case the Court was clearly of the opinion that "A subsequently formed purpose to hold the property of a business corporation for an exempt institution to which all its stock had been given" did not entitle it to exemption under § 101 (14) as a corporation "organized for the exclusive purpose of holding title to property" for, and turning over the net income of such property to, an exempt corporation.

The Roche's Beach case indicated, and both of the Sun-Herald cases held, that a business corporation organized for profit cannot claim exemption as a corporation organized exclusively for an exempt purpose by merely transferring its stock to an exempt organization pursuant to a purpose formed subsequent to its original organization. The only disagreement in these cases was as to the necessity of considering the original articles of incorporation as the only evidence of the purpose of organization. To the same effect see Bear Gulch Water Co. v. Commissioner, 9 Cir., 116

F.2d 975. There the Regents of the University of California became the owner of all of the stock of the taxpayer which was organized as a business corporation for profit. The Court held, however, that the corporation did not become an exempt corporation under § 101(6) merely because its stock had been acquired by an exempt organization.

Neither can we find any reasonable basis in the evidence of this case for the finding and conclusion of the Court below that the plaintiff after November 29, 1944, was operated exclusively for scientific or educational purposes within the meaning of § 101(6).

Immediately after its organization the plaintiff continued to operate its business just as it had operated prior to that date. It continued its vast research and development work and the activities of its patent department, expending in the Riverside plant and its patent department in the years 1944 through 1946 the total sum of $3,656,810.94. It still continued to attempt to develop and discover new processes, to obtain patents thereon, to sell licenses to use these patented processes to the smaller independent oil companies; and to permit such use, royalty free, by the major oil companies who held irrevocable licenses or immunity agreements.

During the three years, 1944-1946, plaintiff secured 382 United States patents and 142 foreign patents which these oil company donors could use royalty free during the life of the patents. The value of the use of all of plaintiff's patents by the major oil companies is shown by the fact that during those three years the small, independent oil companies paid for their licenses the total sum of $12,030,447.12. That the donors recognized the value of the research, development and patent work of the plaintiff is shown by the Fourth Article of the trust agreement which provides that regardless of the other Articles of the trust agreement the trustee shall not "cause or permit Universal to discontinue research and development work in the petroleum field and the ownership and licensing of processes, patents and patent rights relating to the petroleum field." The donors thus

provided that the plaintiff should continue to carry on the research, development and patent work in the petroleum field, work which was to be financed primarily by the smaller independent oil companies, work the results of which for years to come, could be used royalty free by the donors and their subsidiaries. In this Fifth Article of the trust agreement it was stated that the donors considered this activity by the plaintiff to be for the public good but it seems perfectly clear that here, as in Underwriter's Laboratories, Inc., v. Commissioner, 7 Cir., 135 F.2d 371, the interest of the public was only secondary and that the primary and major interest was for the financial and business advantage of these major oil company donors. In the Underwriter's Laboratories case this Court was considering the claim for exemption of Underwriter's Laboratories, Inc., which was incorporated as a non-profit corporation and had never declared a dividend or attempted to divide its profits with its members. It was organized by fire insurance companies to make investigations and carry on research work as to insurance hazards and risks. It conducted tests, experiments and investigations into the causes of losses against which insurance companies insure. It furnished this information free to its members, most of whom were insurance companies, and this information was also made available to a wider group of the general public through publications, movies and the radio, all of which agencies extolled the work and services of the taxpayer. The taxpayer there also had a testing service which it offered only to manufacturers to determine the resistance of the manufacturer's product to fire hazards and the part they might play in casualties usually insured against by insurance companies. If the manufactured product met the taxpayer's standards the fact was publicized and the taxpayer's label was placed upon the product to indicate that the product had met the test. If the product did not meet the test nothing was said or done about it. For these tests the taxpayer charged the manufacturers fees, the amount of which did not depend on whether the product passed the test. The taxpayer there

in two different years made large refunds to the manufacturers who used its label service, such refunds being made from the excess which the taxpayer had charged the manufacturers above its costs. After considering the facts of that case this Court, in an opinion by Judge (now Mr. Justice) Minton said, 135 F.2d at page 373:

"This does not sound like charity to us. If it is charity, it began at home. It was not the public interest that prompted the establishment of the petitioner. It was financial gain and business advantage. The primary concern of the petitioner was that of its membership, made up almost entirely of insurance companies, and the manufacturers who paid its ample fees. Whatever benefit inured to the public was only incidental to the primary concern. An institution that operates primarily for the benefit of private parties and only incidentally for the public is not a charitable institution in fact or within the meaning of the statute under consideration. Whatever benefit the public received was not as 'a gift for public use' Kain v. Gibboney, 101 U.S. 362, 365, 25 L.Ed. 813, but was to enable someone to sell something to the public by giving to the public something better than it otherwise would have received. That may be good business, but it is not charity.

"Neither is the petitioner a scientific institution within the meaning of the statute. It did not operate on the basis of science for the sake of science. It was science for the sake of business. The fact that scientific methods were used by the petitioner does not alter the case. Most business today uses some kind of scientific processes or methods."

The language used in the Underwriter's case seems particularly applicable to the factual situation with which we are now confronted. Here, as there, the entire business of plaintiff was for the business betterment of those engaged in the petroleum industry and especially of the major oil companies who were to receive without cost the benefits of all of the plaintiff's discoveries or inventions. Various facts in connection with the operation of the plaintiff bear out this conclusion. Prior to the transfer of plaintiff's stock and securities to the trustee the plaintiff had paid annually large portions of its earnings to its stock and security holders. After the transfer it was thought necessary by the directors, who were being paid $500 and expenses for each meeting they attended, that the plaintiff should have large reserves to protect it against certain pending claims and to provide funds from which it could improve and modernize its research plant and equipment. This feeling on the part of the directors, however, did not cause a reduction in the expenses of the operation of its Riverside plant or of its patent department. It only resulted in a saving on the amounts paid to the Trustee on its stock and notes. During the three years, 1944 through 1946, it paid to the trustee a grand total of $258,963.49 as compared to $3,656,810.94 which it spent on the Riverside plant and the patent department. This payment to the trustee was out of total net earnings of $7,339,583.61 and out of $17,820,497.80 of gross income.

In view of the manner in which plaintiff was actually operating, it is understandable that in amending the charter by the addition of a Tenth Article, consisting of recitals calculated to give the appearance of an exempt organization, a last sentence was included which reserved the right to continue to operate "as a stock and business corporation for profit," subject only to the qualifications therein contained.

In Better Business Bureau v. United States, 326 U.S. 279, at page 283, 66 S.Ct. 112, at page 114, 90 L.Ed. 67, the Supreme Court in considering the proper interpretation of "organized and operated exclusively for * * * scientific * * * or educational purposes," stated: "In this instance, in order to fall within the claimed exemption, an organization must be devoted to educational purposes exclusively. This plainly means that the presence of a single non-educational purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly educational purposes."

In the instant case the scientific or educational purpose of plaintiff's operation instead of being exclusive was only inciden-

tal to the primary purpose of research, development and securing patents in the petroleum field for the benefit of the petroleum industry and particularly for the major oil companies, in order to improve their business, increase their sales and thereby secure to them greater profits. Resulting benefits to the public were only incidental. As said in Better Business Bureau v. United States, supra, 326 U.S. at page 283, 66 S.Ct. at page 114: "Even the most liberal of constructions does not mean that statutory words and phrases are to be given unusual or tortured meanings unjustified by legislative intent or that express limitations on such an exemption are to be ignored."

To grant plaintiff's claim to exemption in this case it would be necessary to ignore the plain intent of Congress as expressed by the language used in § 101(6).

After consideration of the entire record we must find and hold that plaintiff was neither organized nor operated exclusively for any of the exempt purposes mentioned in said section.

Since plaintiff does not meet the requirements of being organized and operated for any of the exempt purposes it is not the type of organization described in § 101(6) and we do not need to consider the claims of the Government that it failed to meet the other two requirements. Unity School of Christianity, 4 B.T.A. 61, 67, 68.

### Tide Water Accrual.

Under this heading we have the issue of whether plaintiff, which used the accrual method of accounting in reporting its income and deductions, should have included in the income it reported for 1945 royalties of $1,035,205 which it received from Tide Water Associated Oil Company in four annual installments beginning in 1945, and which plaintiff reported annually as received.

In 1942 the plaintiff and five other oil companies, pursuant to recommendations of the Petroleum Co-ordinator for War, entered into an agreement, known as Recommendation 41 Agreement, for the purpose of making available to all refineries, particularly those producing aviation gasoline for the war effort, processes for catalytic refining on which the six companies held patents. This agreement designated plaintiff as one of the licensing agents to grant licenses for the use of such processes.

This agreement prescribed the form of license agreement which should be used in granting such licenses and provided that plaintiff should collect royalties payable on all licenses granted by it and should then account for and pay over such royalties to the parties to the agreement in such shares as the parties should determine. The specified form of license agreement provided that the licensee might pay running royalties based on the amount of production or might convert such running royalties to a paid-up basis and thereby acquire a fully paid-up license. The Recommendation 41 Agreement also provided for cross licensing of patent rights among the parties to the agreement and further provided that on all licenses granted, the licensing agreement should provide for the exchange, between the parties to the agreement and the licensee, of information on all developments or improvements on the processes acquired by any of the parties during the period of the war and for six months thereafter.

In 1943 Tide Water employed the plaintiff for engineering services necessary to the construction of a Fluid Catalytic Cracking Unit at Avon, California. As a part of this service the plaintiff furnished Tide Water the necessary plans, specifications and information to construct the plant so as to utilize the process on which the parties to the Recommendation 41 Agreement held patents. From the time plaintiff was so employed it was understood by Tide Water and by the plaintiff that they would enter into a written licensing agreement granting Tide Water a license to use the patented process embraced in said unit. The actual execution of such licensing agreement, however, was delayed until April, 1945, at which time the unit had been completed and had been in operation for about four months.

The licensing agreement as finally executed actually consisted of three docu-

ments, all of which were executed and delivered at the same time, and all dated as of July 23, 1943. The three documents were a License Agreement, a Basic Agreement, and a Guarantee Agreement.

The License Agreement granted Tide Water the right to use the process on which plaintiff and its associates owned patent rights. It provided that plaintiff and its associated oil companies were to furnish Tide Water through plaintiff, full information and knowledge of all improvements, developments and new techniques relating to the operation of the licensed process made and acquired by any of the licensor companies prior to six months after the termination of the war, and that Tide Water should likewise make available to the licensor oil companies all such improvements, developments and operating techniques which it made or acquired during said period. These provisions for the exchange of information were pursuant to the Recommendation 41 Agreement. The License Agreement also provided for the payment of royalties by licensee either on a running or a paid up basis, for the protection of licensee against claims of patent infringement and for all of the other terms and conditions of the license except as such terms and conditions were modified by the other two agreements.

The Basic Agreement modified the provisions of the License Agreement as to paid-up license by providing that Tide Water might pay royalties in the total amount of $1,808,219 ($1,035,205 of which would belong to plaintiff) payable in four annual installments, the first installment payable on the effective date of the license. By this agreement Tide Water reserved the right to anticipate all or any part of such payments and agreed to pay interest at the rate of 2% per annum from the effective date of the paid-up license on any unpaid balance of such total amount. The Basic Agreement also expressly provided that neither the filing, pendency, nor determination of any infringement suit should excuse Tide Water from paying any installments on account of paid-up royalties, except that any sum that might become payable under a final judgment and which

was not paid by plaintiff should be off-set against any unpaid installments of paid-up royalties.

Section 1 of the Guarantee Agreement provided that Tide Water should receive from plaintiff without charge all information and services customarily furnished by Universal to its licensees for operation of the Fluid Catalytic Cracking Process. It was agreed between the parties that such services consisted of four types, namely, (1) periodical safety inspections, (2) furnishing a crew of plaintiff's employees to start up the plant and to train licensee's operators, (3) furnishing a group of consulting engineers who upon call by the licensee would go to licensee's plant and try to discover the cause of any trouble, and (4) checking runs and method of operations of licensee's unit occasionally to determine how the plant might be changed to improve its yield.

Section 2 of the Guarantee Agreement provided that the payment by Tide Water of principal and interest for a paid-up license should be subject to the provisions of the Guarantee Agreement which followed section 2, particularly those relating to Tide Water's right to withhold royalty payments in the event plaintiff should fail to meet its guarantees of performance as thereinafter stated.

The agreement then proceeded to guarantee certain standards of performance and production by the Tide Water Unit and provided for test runs to demonstrate that such performance guarantees had been met. It was also provided that the last three installments on the paid-up license should be paid on the specified dates if certain test runs had been successfully completed or had been waived by Tide Water. It was provided that if the Unit failed to meet any of the required tests, the plaintiff at its expense should promptly make such changes as were necessary in order for the plant to meet the guaranteed standards of performance and production.

The agreement also provided that in the event of an unsuccessful test on either type of catalyst, installments of paid-up royalties might be withheld until a successful

test had been completed unless Tide Water had waived guarantees in respect thereof; and that no interest should be payable on any royalties so withheld.

Proposed drafts of these contracts had been submitted and discussed by the parties in 1944. On December 29, 1944, Tide Water wrote a letter to the plaintiff stating that it thereby elected to pay royalties on a paid-up basis and that it reserved the right to pay same in a lump sum or in installments as provided in the Basic Agreement.

On February 21, 1945, Tide Water advised plaintiff by telegram that it was satisfied with the results on the test runs on both types of catalysts and that upon receipt of fully executed agreements and the approval by the Petroleum Administration for War it would give formal written notice to plaintiff that plaintiff's performance guarantees had been fully met and that plaintiff's obligations thereunder were fully discharged. In this telegram Tide Water also requested plaintiff to immediately discontinue the work of plaintiff's operators "except as any further specific arrangements may be made" and also urged that agreements covering the license be executed and returned as promptly as possible.

By letter of April 4, 1945, Tide Water notified the plaintiff that: "This is to advise that your representations as to performance of said Unit have been met and that your obligations under said performance guarantees have been fully discharged."

By another letter of the same date Tide Water again informed plaintiff that it had elected to pay the royalties, totalling $1,808,219, on the paid-up basis in installments as provided in the Basic Agreement and accordingly was attaching its check in the sum of $452,054.75 in payment of the first installment. Petroleum Administration for War by a letter, dated April 14, 1945, approved the agreement between plaintiff and Tide Water. Mr. Behrens, the Secretary of the plaintiff testified that such approval by the Petroleum Administration for War, according to his belief, constituted "the last of the conditions that were performed, and I think that probably

could be said to be the really effective date of the agreement, either that, or when we got payment." (April 4, 1945).

The plaintiff now contends, however, that its obligations to Tide Water were not fulfilled when the plant had met all of the performance guarantees and gives this as its reason for not having accrued and reported the total amount of Tide Water's payments for 1945.

The plaintiff lists these additional obligations as follows:

"(a) that plaintiff should continue to render to Tide Water, in connection with the operation of the plant, its customary services, including periodic inspections, the furnishing of a crew to train Tide Water's operators, assistance in operating problems which might from time to time arise and periodic analyses of Tide Water's operations so as to determine the means of operating the plant at the highest efficiency;"

(Mr. Behrens testified that the provision providing that plaintiff should continue to render to Tide Water its customary services to licensees was seldom inserted in a licensing agreement but that plaintiff had voluntarily rendered these four types of service to its licensees through all the years.)

"(b) that plaintiff should from time to time make available to Tide Water all improvements and developments, patented and unpatented, made by plaintiff or acquired by plaintiff from others in the field of catalytic cracking;

"(c) that plaintiff should at its own expense defend Tide Water in any suits brought against it for infringement of the patents of others by reason of Tide Water's use of the licensed process and, to the extent of the royalties paid by Tide Water, save Tide Water harmless from any damages in such suits;

"(d) that plaintiff should make available to Tide Water patent rights and processing rights under any additional inventions or discoveries in the field of catalytic cracking by any of the other parties to the Recommendation 41 Agreement and should impart to Tide Water any additional

information and know-how in the field of catalytic cracking which might at any time be acquired by any of the other parties to that agreement."

The plaintiff insists that because of these remaining obligations to Tide Water the plaintiff, even though it used the accrual method of accounting, was not required to report the amount of the Tide Water paid-up royalties until the four installments were actually paid.

The general rule for accounting by the taxpayer as stated in 26 U.S.C.A. § 41 is that he shall compute his net income upon the basis of his annual accounting period and in accordance with the method of accounting regularly employed in keeping his books.

26 U.S.C.A. § 42(a) provides: "The amount of all items of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under section 41, and any such amounts are to be properly accounted for as of a different period. * * *"

We find the following definition for "paid or accrued" in 26 U.S.C.A. § 48(c): "The terms 'paid or incurred' and 'paid or accrued' shall be construed according to the method of accounting upon the basis of which the net income is computed under this Part."

In the trial of this case in the District Court, counsel for the plaintiff stated that, "The general rule (as to the accrual and reporting of income) is that when a person becomes unconditionally entitled to receive money, he must accrue it, notwithstanding the fact that he who owes it to him has a right to pay it in installments." Plaintiff contends, however, that because of its continuing obligations under the contract, Tide Water was not in 1945 unconditionally bound to pay the last three installments on its paid-up license and plaintiff was therefore not obligated to accrue and report the amount thereof as part of its 1945 income.

To support its contention the plaintiff has cited three principal cases, the first of which is Lucas v. North Texas Lumber Company, 281 U.S. 11, 50 S.Ct. 184, 185, 74 L.Ed. 668. In that case the taxpayer gave a purchaser a ten day option to purchase its timberland. The option was given on December 27, 1916. On December 30, 1916 the purchaser notified the taxpayer that it would exercise the option but in the notice stated that it would be ready to close the transaction and to pay the purchase price "as soon as the papers were prepared." The taxpayer did not prepare the papers and deliver them until in 1917. The Court held that, "Consequently unconditional liability of the vendee for the purchase price was not created in that year (1916)." There, of course, the express condition precedent to the purchaser's liability was the preparation and delivery of the papers and that condition was not met until in 1917.

In Cleveland Trinidad Paving Company v. Commissioner, 20 B.T.A. 772, affirmed 6 Cir., 62 F.2d 85, cited by plaintiff, a taxpayer on the accrual basis performed work under a paving contract for a municipality which, pursuant to the contract, retained ten per cent of the contract price as a guarantee fund until the following year. In that case, as the Court pointed out, it was not disputed that the amount of the retained percentage might be materially reduced in the event of necessary repairs, or the subsequent disclosure of a failure by the taxpayer to comply with the specifications of the contract. Until the expiration of the period of the guarantee, the obligation of the municipality remained only a contingent promise to pay, and the retained percentage was not to be considered income to the taxpayer until the amount thereof became unconditionally payable. There the retained amount was held to guarantee plaintiff's performance. Here the performance guarantees had all been met.

The third case cited by plaintiff as supporting its contention is Vallejo Bus Company v. Commissioner, 10 T.C. 131. In that case the sale, and therefore the obligation to pay, required the approval of a governmental agency, the Railroad Commission of California. The Court held that the obligation to pay did not become binding until the required approval was secured. In the instant case, the necessary ap-

proval of the governmental agency, the Petroleum Administration for War, was secured in April, 1945.

Careful consideration of the three documents which constituted the agreement between the parties convinces us that the parties intended to, and did, negotiate a sale from the taxpayer to Tide Water of the right to use the Fluid Catalytic Cracking Process covered by the patents of the plaintiff and its associated oil companies; that this sale and the obligation of Tide Water to pay the unpaid balance on the paid-up license became absolute in April, 1945, when Tide Water advised the plaintiff in writing that plaintiff's obligations under its performance guarantees had been fully discharged and when the Petroleum Administration for War approved the agreement between the parties. We find evidence of this intention in each of the three documents which constitute the agreement of the parties.

Section 2 of the Guarantee Agreement expressly provided that payment of the installments should be subject to the provisions of that agreement which followed section 2. The provisions which followed were the performance guarantees. From the fact that the payments were expressly made subject only to the provisions following section 2, we may assume that the parties did not intend that the payments were to be subject to the provisions of section 1 which preceded. Section 1 of the Agreement was the provision that Tide Water should receive from plaintiff the information and services which plaintiff customarily furnished its licensees. These are the continuing services on which plaintiff strongly relies. Ordinary rules of construction prevent our considering the performance by the plaintiff of the obligations mentioned in section 1 as being conditions precedent to the obligation of Tide Water to pay the remaining installments.

The License Agreement between the parties granted Tide Water the license and by section 7 Tide Water promised to pay royalties therefor. Section 9 of the License Agreement provided that the agreement might be terminated by the parties and that in the event of such termination the licensee should continue to have the right to use the Fluid Catalytic Cracking Process *to the extent that the licensee shall theretofore have acquired a fully-paid license therefor.* Section 10 of the same agreement provided that in the event that another licensee should be granted a similar license at lower royalty rates, Tide Water was to be given the benefit of such lower rate, but also provided that *such lower rate should not be applicable with respect to operations for which a paid-up license had been acquired by Tide Water prior to the grant of such lower license rate.* It would seem that in these two sections the parties were considering a paid-up license, such as Tide Water had elected to take and had taken, not as an executory contract, but as a sale which had been fully executed, except as to the payment of a portion of the agreed price.

Section 1 of the Basic Agreement provided for the terms and conditions on which Tide Water might acquire a fully-paid license and for the payment of interest on any unpaid balance of the purchase price. By this section of the Basic Agreement, Tide Water was also given the privilege of anticipating all or any part of such installments.

Section 8 of the same agreement provided that Tide Water might, under certain conditions, terminate the agreement with the plaintiff, but that "No such termination shall relieve Tide Water from any obligation or liability accrued hereunder prior to the effective date of such termination, including, without limitation, obligations to make payments under section 1 hereof." It was section 1 of this agreement which provided for the payment in four installments of a fixed sum for a paid-up license. This provision of section 8 would, therefore, also indicate that the obligation of Tide Water to make such payments for a paid-up license was considered by the parties as an accrued obligation which Tide Water was obligated to pay even after the termination of the contract. Section 4 of the Basic Agreement expressly provided that neither the filing, pendency nor termination of any infringement suit should excuse Tide Water from

paying any installments thereafter payable on account of any paid-up royalty, except that any sum that might become payable under a final decree or final judgment on such a claim, and which was not paid by the plaintiff, should be off-set against installments of paid-up royalties which then remained unpaid. We find in this provision the only intimation, other than in the performance tests which had been met, in any of the three agreements that any part of the four installments of paid-up royalty might not be received by plaintiff. In this provision we have a vague contingency which could only happen if an infringement suit should terminate in an adverse final judgment calling for payment, and if the plaintiff should not first pay the same out of other funds.

It is true that in section 1 of the Guarantee Agreement the plaintiff agreed that Tide Water should receive the information and services customarily furnished by the taxpayer to its licensees. But, as we have indicated above, a consideration of the entire Basic Agreement clearly indicates that the parties did not intend that performance by plaintiff of these obligations should be considered as a condition precedent to Tide Water's obligation to pay. Also it was shown by uncontradicted evidence that the information and services which plaintiff there promised were the same information and services it had furnished to all of its licensees as a matter of good business throughout the years. At the time the contract was signed plaintiff had already performed part of this service. It had furnished a crew of its men to train Tide Water's operators. This is shown by the fact that the plant had then been operating for four months, and Tide Water, by its telegram of February 21 had indicated that it then desired the plaintiff's operators withdrawn from the Avon plant.

■ The provision that Tide Water should be furnished information as to all improvements and developments made by plaintiff and its associated oil companies was included pursuant to the Recommendation 41 Agreement, and obligated not only the plaintiff but also obligated Tide Water

to make available any such information which it secured during the period in question to the plaintiff and to plaintiff's associates. Here were merely mutual promises to exchange information for mutual benefit, promises which could not be held conditions to the grants of the license nor to the payment therefor.

As we have shown above, it was expressly provided in the Basic Agreement that even an attack on the patents for which Tide Water had secured a license would not affect Tide Water's liability to pay the four installments, unless such an infringement suit had resulted in a final judgment against Tide Water for the payment of money and plaintiff failed to pay such judgment. Only then could Tide Water off-set the amount payable under the judgment against the unpaid installments for the paid-up license. The possibility of such a contingency happening would be slight. The patents involved had been through the fire of much litigation. They were owned by the major oil companies which were financially responsible.

■ Vague possibilities that income may have to be returned, or that it may possibly be subject to diminution or off-set will not alone suffice to postpone the accrual and reporting of taxable income. In Shelley, Petitioner v. Commissioner, 2 T.C. 62, the Pershell Engineering Company furnished the design, drawings and specifications for an oil refinery in Rumania. The construction of the refinery was begun in 1936 and completed in 1938. The contract with the Pershell Company called for a 15 day test run to prove that the refinery met performance guarantees. The test run began late in July, 1938, and would have been completed on August 13th. Only a few days before the completion of the successful test run the Pershell Corporation was dissolved. Even under these facts the Tax Court held that the income which was received from the Rumanian company was the income of the Pershell Company and not the income of its stockholders; that this income had accrued to the corporation prior to its dissolution, even though the test run had not been entirely completed.

In Helvering v. Nibley-Mimnaugh Lumber Company, 63 App.D.C. 181, 70 F.2d 843, the taxpayer negotiated the sale of its property including a tract of timberland. In August, 1923, a contract of sale was executed. It provided that part of the purchase price be paid in cash and that the obligation to pay the balance be evidenced by promissory notes secured by a mortgage. The contract also provided that the taxpayer should furnish abstracts and that for certain contingencies as to failures of title and as to there being a smaller amount of timberland than specified in the contract there should be a reduction in the purchase price. Such reductions, if any, were to be applied against the principal of the notes. By reason of a shortage in the timberland, determined in 1924, it was agreed between the parties that more than $66,000 of the stated sale price should be deducted from the notes representing the balance of the purchase price. The Court held that if the taxpayer was reporting and paying taxes on an accrual basis, the facts shown were sufficient to accrue the entire purchase price in 1923, even though the agreed price was conditionally subject to abatement. The Court said that the right of the seller to have the notes paid, accrued in 1923, because it then became a fixed and unconditioned liability. It is significant that in that case there was, as here, a condition which provided for a proportionate reduction in the purchase price in the event of the happening of a certain contingency.

Frost Lumber Industries v. Commissioner, 5 Cir., 128 F.2d 693, 696, also involved the sale of a large tract of land the sale of which was begun in one year but was not completed until the following year. The option for the purchase which was accepted in 1935 fixed a price of a certain amount per acre. The title was not approved until the following year, 1936, and the title being bad on some of the land, condemnation proceedings were necessary, the cost of which was assessed against the taxpayer under the warranty contained in his deed. The Court there said, however, "Where a purchase price is conditional and subject to subsequent abatement, the sale may nevertheless for tax purposes be considered as concluded on the date of its agreement." The Court pointed out that, approval of the title by the Attorney General was an incident which left only the final accounting and not the obligation for future determination. The Court said that the conduct of the seller and purchaser established the fact that for tax purposes it was a closed transaction. This language is equally applicable to the instant case.

The most recent decision on this question is Clark v. Woodward Construction Company, 10 Cir., 179 F.2d 176. The taxpayer there did certain highway construction work for the Highway Commission of Wyoming. The work was completed, accepted by the Commission, and all but fifteen per cent of the contract price was paid to the taxpayer in 1942. Pursuant to a state statute the fifteen per cent was withheld in order to give forty days notice of final settlement and acceptance of the work to claimants who might have claims against the contractor. If publication of the notice had brought out claims of third persons against the contractor relating to the contract they would have been paid from the withheld amount. But, as the Court pointed out, such payments would have been paid from the withheld money of the taxpayer and for such payments the taxpayer could have claimed deductions. The Court held that under these circumstances the taxpayer, which was on the accrual basis should have accrued and reported the entire amount of the contract price in 1942 when the liability was determined and became fixed. There was no actual guarantee period there during which part of the funds were withheld to guarantee performance by the contractor.

We see from these decisions that it is not every contingency that prevents the accrual of income. The contingency must be real and substantial. With every warranty deed conveying real estate a grantor warrants the title to the grantee just as the taxpayer here warranted the validity of the patents against claims for infringement. No one would contend, however, that the contingency created by the warranty contained in the warranty deed

would so affect the promise of the grantee to pay that the grantor, if on an accrual basis, would not have to accrue and report as income the entire consideration for the deed, even though part of the payment of consideration was postponed.

The contract here in question was not a contract for services. The letter from Tide Water to plaintiff dated October 31, 1944, shows that there had been a service contract, entered into between these parties in 1943, under which the plaintiff had rendered engineering services in the construction of the Tide Water plant. These services included the furnishing by plaintiff of operators in placing said plant in operation. The letter contained the promise of Tide Water to pay for said services and the method for determining the amount. This agreement for services had been fully performed and had nothing to do with the contract which the parties executed in April, 1945. In the latter contract the only services mentioned were of a minor nature, services which were to be rendered in the future and which were merely incidental to the grant of the license to Tide Water.

Under the provisions of the April, 1945 agreement Tide Water might have gone along paying running royalties, the amount of which would have been determined by its production. Instead, it elected to take, and did take, a paid-up license for the use of the patented process, a license which could not be terminated. For this license it agreed to pay a definite amount payable in four equal installments, and to pay interest of two per cent per annum on the unpaid balance. Tide Water agreed to pay this interest as compensation for the use of the plaintiff's money.

Under the circumstances of this case the obligation of Tide Water to pay the total amount of the paid-up royalties became fixed and definite in April, 1945, when all of the performance tests were successfully met and the License Agreement was approved by Petroleum Administration for War. We must, therefore, hold that it was the duty of plaintiff to accrue and report as a part of its 1945 income the total amount of $1,035,205, which it was to receive as its share of the consideration for the license.

## Deduction of Skelly Suit Expenses.

The issue presented by this phase of the case is the claim of the plaintiff to deduction from its gross income of the amount it expended in each of the years 1942 to 1946, inclusive, in the prosecution of an infringement suit in which South Dakota was plaintiff and Skelly Oil Company was defendant. The claim of the plaintiff was sustained by the judgment of the District Court.

A brief review of the various contracts between the parties is necessary to an understanding of the question here presented.

In 1931 the stockholders of South Dakota sold to the United Gasoline Corporation the capital stock of South Dakota. By the contract of sale, dated January 2, 1931, the stockholders reserved, for the benefit of themselves and two others, certain assets of South Dakota. One of such reserved assets was the right to receive any sums thereafter collected by South Dakota from Skelly on the infringement suit which South Dakota had commenced against Skelly in 1926. This reservation was subject to the provision that the first $166,666.66 of such recovery should be paid to United; and it was also provided that the stockholders' committee should have the sole right to settle such suit in its own discretion without cost to South Dakota and without written consent of United if the settlement was for not less than a net amount of $166,666.66. The contract of sale also provided that South Dakota should pay to Unopco (a corporation organized for the purpose of receiving and holding the reserved assets for the South Dakota stockholders) all of the reserved assets or the proceeds thereof, after deducting the out-of-pocket expenses incurred by South Dakota in collecting the same.

On January 1, 1932 South Dakota and plaintiff executed a written bill of sale and agreement by which South Dakota transferred practically all of its assets of every nature to plaintiff and by which plaintiff assumed practically all of the debts

and liabilities of South Dakota. However, there was expressly excluded from this transfer all letters patent and all of the right, title and interest of South Dakota "in, to and under suits instituted by it for damages sustained by reason of infringement of any of its letters patent." The prosecution of the Skelly suit was continued in the name of South Dakota.

In 1934 United merged with the plaintiff, transferring to plaintiff, among other assets, its interest (the right to receive the first $166,666.66) in the proceeds of the Skelly suit and its entire ownership in the stock of South Dakota and of plaintiff.

In 1935 Unopco, United, South Dakota and the plaintiff entered into an agreement in which plaintiff agreed "insofar as permitted by law" to continue to make disbursements as theretofore for the collection of the reserved assets, pursuant to the original (1931) sales agreement. Unopco agreed that it would continue to reimburse the plaintiff for all such expenditures, and that it would also reimburse plaintiff for the amount of any income taxes, including interest and penalties, which plaintiff should be required to pay by reason of the disallowance of deductions of such expenditures, claimed by plaintiff in its tax returns for 1932 and subsequent years.

In 1938 Unopco was dissolved and its assets transferred to a trust of which its stockholders were the beneficiaries. The agreement creating this trust recognized the validity of the earlier agreements concerning the Skelly suit expenses and authorized and directed the trustees to pay out of the trust assets the necessary costs and expenses "to insure the continuance of the prosecution of said Skelly suit."

In August, 1945, the trustees wrote the taxpayer a letter which was approved by the taxpayer as constituting "a re-statement in clarified form of the understanding between us." This letter stated that it was the intention of the parties in 1938, when the trust agreement was executed, to continue the prosecution of the Skelly case and the payment of the expenses thereof by the plaintiff, subject to reimbursement by the trustees in the same manner as those expenses were borne by plaintiff and reimbursed by Unopco prior to the creation of the trust. The letter stated further: "It is, of course, understood that the undersigned, as such trustees, will reimburse you for all expenses incurred by you in connection with the prosecution of the Skelly case, less the amount of federal income taxes, if any, saved by you through allowance of such expenses as deductions for federal income tax purposes; and as such trustees we also will indemnify and save you harmless from and against any income taxes, including interest and penalties, which you shall at any time be required to pay by reason of the disallowance of such deductions."

The Skelly suit was settled in 1948 by Skelly paying to South Dakota $225,000. The agreement between the trustees and the plaintiff as to the distribution of this amount is disclosed in a letter dated February 27, 1948, which the trustees wrote to South Dakota and plaintiff jointly, and which was approved by the plaintiff. The letter provided that South Dakota should include the entire amount received by it in its income tax return without deductions; that South Dakota should retain out of said amount a sum equal to the income tax reported and paid thereon by it; that South Dakota should also retain or pay over to plaintiff $85,000 to be held as security for the performance by the trustees of their obligation to indemnify plaintiff and save it harmless against the payment of income taxes, including penalties and interest, which plaintiff should at any time be required to pay by the disallowance of its claim for deductions of the Skelly suit expenses.

It was further provided, that, in consideration of all of the above, plaintiff waived its right to the $166,666.66; and that South Dakota, after deduction of its income taxes and the $85,000 to indemnify plaintiff, should pay to the trustees the balance remaining of the $225,000. It was also agreed that any balance of the $85,000 remaining after the final determination and payment of the amount of plaintiff's tax liability respecting the claimed deductions

for the expenses of the Skelly suit, should be paid to the trustees.

From these various agreements it is clearly shown that: (1) At all times here in question the trustees of the reserved assets were the beneficial owners of the net sum to be realized from the prosecution of the Skelly suit. (2) That while plaintiff was to pay the expenses of the Skelly suit it was to be reimbursed for all such expenditures.

In other words, it is clear from the contracts and letters of the parties that they considered and intended these expenditures by the plaintiff as advancements for the benefit of the owners of the reserved assets; and that plaintiff was to be fully reimbursed by Unopco or by the trustees. Ample funds were held at all times to insure the reimbursement of the expenditures as well as all taxes, penalties and interest that plaintiff might be compelled to pay because of a disallowance of the claimed deductions.

This understanding of the parties is also shown by the manner in which plaintiff kept books and by the explanation of Mr. Jefferson, an expert accountant, who had handled plaintiff's income tax matters and who testified in the trial of this case. Throughout the period here in question the plaintiff maintained in its "Accounts Receivable" ledger an account in the name of Unopco Corporation. All expenditures which it made in the prosecution of the Skelly case were charged to Unopco Corporation in this account. As of December 31, 1946, this account was balanced to show that Unopco Corporation owed plaintiff nothing. Part of the credits to the account represented cash payments by Unopco Corporation or the trustees to plaintiff, while other credits were from plaintiff's surplus account. The credits to Unopco from the the surplus account represented the amount of the reduction in plaintiff's federal income taxes by its having claimed deductions for the amount of such expenditures. Thus, we see that plaintiff's books show reimbursement in cash for the cash it expended in the prosecution of the Skelly suit minus its savings in income taxes from deductions, and, as we have seen above,

plaintiff was guaranteed repayment of all taxes it might later have to pay by reason of such deductions being disallowed.

The plaintiff insists that these expenditures in the prosecution of the Skelly suit during the period in question represented ordinary and necessary expenses paid or incurred during the taxable year within the meaning of § 23 of the Revenue Act of 1942, as amended. 26 U.S.C.A. § 23 (a) (1) (A). With this contention we cannot agree.

In the first place the expense was not an ordinary and necessary expense of the plaintiff. The beneficial ownership of the claim against Skelly was first in Unopco and then in the trustees who succeeded to the rights of Unopco. The action was one in which they were primarily interested and the expenses of which they asked plaintiff to pay on their guarantee of reimbursement. Both the books of the plaintiff and also the testimony of Mr. Jefferson, plaintiff's witness, showed that plaintiff was reimbursed in full. In answer to the question, "Did they get the expenses they paid, back from the trustees or Unopco less the tax saving for income taxes by virtue of being allowed a deduction for those expenses?" Mr. Jefferson answered, "Yes, they got a net amount back." He was then asked, "That was based on the amount they paid less the amount that they saved by being allowed those items as deductions on the income tax return, is that correct?" And he answered, "That is the effect of the item. The basis of it may be more intricate."

■ The plaintiff contends that the actual agreement between Unopco (and later the trustees who succeeded to Unopco's assets) and itself for refunds was, that the refunds were to equal the amount by which the assets of South Dakota were depleted by expenditures in the prosecution of the Skelly suit. Whether the understanding be described in these words, or more simply and more clearly in the words of the parties in their various agreements, the result is the same, namely, full reimbursement was promised to plaintiff and full reimbursement was made.

A taxpayer may not claim as a deduction from his income an expenditure for which he has been reimbursed. If he makes it for another and is reimbursed, it is not his expense. Glendinning, McLeish & Company v. Commissioner, 2 Cir., 61 F.2d 950. There the Court refused to allow a deduction where reimbursement of the expenditure was promised and where it was not shown that the reimbursement was actually made. The Court there said, 61 F.2d at page 952: "Being advances made by the petitioner in accordance with its agreement to make them and the agreement of the Belfast company to repay them, the amounts here involved were not within the statute * * * permitting the deduction of ordinary and necessary business expenses, since they could not be expenses of any kind provided the petitioner could and did enforce its right to reimbursement. Although we know that it has not, there is no proof that it could not have required the agreed repayment if it had elected to do so. * * *"

See also Cohan v. Commissioner, 2 Cir., 39 F.2d 540; Island Petroleum Company v. Commissioner, 4 Cir., 57 F.2d 992.

The plaintiff also contends that these deductions were claimed pursuant to an agreement made between the Government and United in 1938 and that the Government as well as the plaintiff is bound by that agreement. The agreement on which the plaintiff depends consists of a proposition made on form 874 of the Treasury Department, entitled "Waiver of Restrictions of Assessment and Collection and Deficiency in Tax and Acceptance of Overassessment" which United executed and filed concerning consolidated returns for United, South Dakota and plaintiff for the tax years 1932 and 1933. In that proposition United agreed that, if it was accepted by the Government, any and all amounts collected, either by South Dakota or plaintiff, on account of claims for infringement of patents as referred to in Article Fourth, Paragraph (c) of the agreement by which United purchased South Dakota should, without exception, be included in income and subject to Federal tax as and when accrued. The plaintiff states that

this proposition, which was accepted by the Deputy Commissioner, included and allowed United's claimed deductions for Skelly expenditures made during those two years.

The contention of plaintiff that the 1938 agreement is binding on the Government as to the years here in question must fail for two reasons. In the first place, plaintiff's proposition was limited to the taxes for the years 1932 and 1933. If the agreement, as contended by plaintiff, did involve the allowance of deductions for Skelly suit expenditures during the two years, the agreement only purported to cover those two years and did not promise allowance of deductions for such expenditures in subsequent years. In the second place, the form filed by plaintiff was not a final closing agreement under the Internal Revenue Act and did not prevent the assertion of a further deficiency in the manner approved by law, should it subsequently be determined that additional tax was due; nor did it extend the statutory period of limitation for refund assessment, or collection of the tax. These limitations on the effect of the agreement were shown by a printed note on the face of the form.

The plaintiff states that the Government made no objection to the deduction of these expenditures in the years 1934 to 1941 inclusive. Improper allowance of the deductions for those years did not change the facts or the law. Plaintiff's written agreement with the Government was to pay income tax on the full amount recovered in consideration of the Government making the settlement with plaintiff on his taxes for the years 1932 and 1933. That agreement has been fully executed. The Government allowed the deductions for those two years and the amount recovered in 1948 has now been reported and the tax thereon paid. The agreement made no mention of deductions for subsequent years and the Government should not permit such deductions. The expenditures made by plaintiff were expenses of the owners of the beneficial interest in the Skelly suit, expenditures for which plaintiff was fully reimbursed.

The District Court erred in allowing these deductions.

### Kanotex Accrual.

This subject presents two questions. (1) Whether securities issued by plaintiff and designated as "A Notes" constituted evidence of indebtedness or · were certificates in the nature of corporate shares. (2) If they are to be treated as corporate shares, whether they should have been included in plaintiff's income at their face value, at which value plaintiff accepted them in satisfaction of a debt, or at their market value when accepted by plaintiff.

Plaintiff sued Kanotex Refining Company for patent infringement. Thereafter, the defense of the suit was taken over by Gasoline Products Company. In 1942, plaintiff and Gasoline Products Company agreed upon a settlement, one of the terms of which was that Gasoline Products Company could pay the first $75,000 payment due on the settlement in cash, or could surrender to plaintiff an "A Note" of plaintiff of the face value of $75,000 in satisfaction of the first installment. Gasoline Products Company purchased an "A Note" of this amount from Atlantic Refining Company for $60,-000 and promptly surrendered it to plaintiff in discharge of $75,000 of the settlement obligation. The plaintiff included in its gross income report for that year the sum of $60,000 as income on this transaction.

The Trial Court found that $60,000 was the market value of the note on the date it was surrendered to plaintiff, and held that plaintiff was correct in reporting only this amount as income. This finding was supported by sufficient evidence.

The Government contended, however, that on this transaction $75,000 of plaintiff's debt was cancelled and therefore the plaintiff should have reported income of $75,000.

These "A Notes" provided that the plaintiff for value received promised to pay to the payee the principal amount of the note with interest thereon at 6% per annum (the interest to be cumulative, not compounded); that payment on the principal and interest should be made semi-annually on March 15th and September 15th in each year; that plaintiff should not be obligated to pay any principal or interest on such notes "except only out of net income" which was defined as "its net income remaining after the payment of all overhead and operating expenses (including expenses of research, development and litigation in respect of patents and patent rights and for the purchase or other acquisition thereof, and for maintenance), and after the making of such deductions and charges for reserve (including a reserve for working capital of not exceeding 20% of such net income) as the board of directors of the corporation shall in its sole discretion see fit to make * * *." The plaintiff further promised therein that it would apply to the payment of principal and interest on such notes "all payments to it constituting lump sum 'royalties' (royalties in respect of 'full paid' licenses), less any expenses of collection, reserves for income taxes or other expenses or deductions necessarily incident thereto * * *."

Plaintiff contends that these notes did not constitute evidence of indebtedness but were in the nature of corporate shares and for the purpose of this tax question should be considered and treated as corporate shares.

The mere fact that they were designated as "notes" is not conclusive of the nature of these securities. Jewel Tea Company v. United States, 2 Cir., 90 F.2d 451, 452, 112 A.L.R. 182. Nor is the fact that the semi-annual payments to be made thereon were denominated "interest" decisive. Commissioner v. Schmoll Fils Associated, Inc., 2 Cir., 110 F.2d 611. United States v. South Georgia Railway Company, 5 Cir., 107 F.2d 3, 5. In Commissioner v. Schmoll Fils Associated, supra, the instruments involved were called "debentures", provided for payment of cumulative "interest" semi-annually from profits, and had no definite due date; but the principal was to be paid in the event of bankruptcy, liquidation or dissolution. They were redeemable at the option of the corporation at 105, and they were subordinated to any amounts owing to any bank or banker.

The Court there held that the debentures were, in effect, corporate stock and that the semi-annual payments to the holders were not payments of interest but in the nature of dividends. The Court said, 110 F.2d at page 613: "In short the debenture-holders do not possess the ordinary right of creditors to obtain unconditional payment of their claims at some time. The position of the debenture holders is that of investors rather than creditors. Almost the only difference between the debenture holders and holders of cumulative preferred stock is that the former may require payment of their interest out of any net earning of the company, whereas preferred stockholders are able to compel payment of a dividend only in case the directors arbitrarily refuse to declare it."

In the instant case, however, it would be very difficult for the holders of plaintiff's "A Notes" to compel any payments of so called "interest" on their notes. According to the express provisions of the notes, it was left to the sole discretion of the board of directors of plaintiff to determine what amount of its gross income should be expended in research, development and litigation in respect to its patents and patent rights, and for the purchase or other acquisition thereof, and as to what reserves should be set up. With all of these matters left to the sole discretion of the board of directors and interest to be paid only out of what remained after all such "expenses" had been paid, the plaintiff might postpone showing any "net earnings" indefinitely.

Here, as in United States v. South Georgia Railway Company, supra, the instrument in question also lacked the "most significant, if not the essential feature of a debtor and creditor as opposed to a stockholder relationship the existence of a fixed maturity for the principal sum with the right to force payment of the sum as a debt in the event of default." [107 F.2d 5]

In 1940 the Government in levying deficiency assessments on plaintiff for 1938 and 1939 found that these same "A Notes" were "in the nature of corporate shares" and, therefore, disallowed the deduction which plaintiff had claimed for interest paid upon them and stated that the plaintiff had agreed to the disallowance of interest on the "A Notes" from 1934 to 1937.

At the same time the Government found that at that time there was an indicated value of only eighty per cent of the par value of these notes; and since the plaintiff had received in the year 1938 approximately $150,000 face value of said notes in payment of royalties and had reported the full amount as taxable, the Government, on the theory that the notes should be treated as corporate stock rather than as evidence of debt, allowed 20% of the amount returned to be eliminated from plaintiff's income for that year. Depending upon the determination by the Government as to the nature of these securities the plaintiff in the intervening years has not claimed deductions for the amount paid as interest thereon.

In its 1940 determination that these securities were in the nature of shares of stock, the Government also determined that where the plaintiff had accepted the notes in payment of royalties the plaintiff should report as income only their market value. We think that was a correct determination and should also be applied in this case. The pertinent regulation, Section 29.22(a)-15 of Regulation 111, provides: "So, also if the corporation receives its own stock as consideration upon the sale of property by it, or in satisfaction of indebtedness to it, the gain or loss resulting is to be computed in the same manner as though the payment had been made in any other property."

If payment here had been made in any other property, the market value of the property as of the date of its receipt would have been returned. We think that under the above Regulation the same rule should apply as to the receipt by plaintiff of these "notes".

In Trinity Corporation v. Commissioner, 5 Cir., 127 F.2d 604, certiorari denied, 317 U.S. 651, 63 S.Ct. 47, 87 L.Ed. 524, the taxpayer transferred certain real estate in exchange for cash and shares of its stock. The Court said, 127 F.2d at page 605: "Under Section 22(a) of the Revenue Act of 1936, 26 U.S.C.A. * * * gains or profits derived from sales or dealings in

property must be included in gross income. The amount realized from the sale or other disposition of property is the sum of the money received plus the fair market value of the other property received. * * *. The fair market value of the stock should have been included in the computation of gain or loss under Section 111(b), supra."

The District Court was correct in holding that these securities for tax purposes should be considered as shares of corporate stock and that they were correctly reported at their market value of $60,000 on the day they were received by the plaintiff.

## Root Deduction.

Plaintiff's cross appeal, appeal number 9905, is from part of the judgment in the action relating to taxes for the year 1944. This appeal is from that part of the judgment which held that plaintiff was not entitled to a deduction for the amount of a claim for unpaid royalties against Root Refining Company which plaintiff released in 1944.

Plaintiff had accrued and reported as part of its gross income in each of the years 1940 to 1943, both inclusive, the amount of royalties which became due from Root Refining Company and was unpaid in each of those years. In July, 1944, as a part of a compromise agreement between plaintiff and Root Refining Company, plaintiff released its claim to these unpaid royalties in the total amount of $356,-867.47. In the tax report for 1944, the plaintiff deducted from its gross income the total amount of these royalties.

The District Court held that plaintiff was not entitled to this deduction.

In the hearing in this Court the parties filed a written stipulation that the royalties so accrued and reported constituted taxable income which the plaintiff realized as reported; and that plaintiff was entitled to deduct the gross amount thereof from its taxable income for the year 1944 when the claim was released.

## Renegotiation Tax Credits.

The District Court held that the judgments it entered for refunds for taxes paid by plaintiff on its income for 1944 and 1945 should not be reduced by the amounts which the War Contracts Price Adjustment Board had credited against the amounts of plaintiff's renegotiation liability on account of taxes which plaintiff had paid on the amounts found to have been excessive profits in those two years.

The War Contracts Price Adjustment Board determined that $700,000 of plaintiff's profits in 1944 and $50,000 in 1945 were excessive under the Renegotiation Act, 50 U.S.C.A.Appendix, § 1191. Plaintiff did not actually pay the Government the total of these excessive profits, but only the difference between these amounts and the taxes it had paid on these amounts. This was because the Board, pursuant to § 3806(b) (1) of the Internal Revenue Code, had allowed plaintiff on its renegotiation liability credit for $280,000 taxes paid in 1944 and $20,000 taxes paid in 1945. These amounts represented to 40% taxes paid on the amounts of its profits which were determined to be excessive in those two years.

The Renegotiation Act provided that no contract with an organization exempt from taxation under § 101(6) of the Internal Revenue Code should be subject to renegotiation. The plaintiff contended that since it was an exempt organization under § 101 (6) it was not subject to renegotiation; that the finding by the Board that it had made excessive profits in 1944 and 1945 was illegal; that its obligation to repay the amount of the excessive profits was invalid; and that giving it these tax credits on an invalid obligation could not be considered as a refund of taxes in the amount of such credits.

Since we are holding that plaintiff is not exempt, its major premise falls and we must hold that the tax credits allowed do amount to refunds of the taxes it paid on the amounts of its excessive profits, refunds that must be considered in determining the amount of any deficiency in its 1944 and 1945 taxes.

Each of the three judgments is reversed and the causes are remanded for further proceedings not inconsistent with this opinion.