**RIO FARMS, Inc. v. SCOFIELD.**

**Civ. A. No. 495.**

United States District Court
W. D. Texas, Austin Division.

March 13, 1952.

As Corrected May 20, 1952.

Thomas Fletcher (of Vinson, Elkins & Weems), Marvin K. Collie (of Vinson, Elkins & Weems), Houston, Tex., Henry Lauderdale, Mercedes, Tex. (Vinson, Elkins & Weems, Houston, Tex., Lauderdale & Bowe, Mercedes, Tex., of counsel), for plaintiff.

Charles F. Herring, U. S. Atty., Austin, Tex., Homer R. Miller, Sp. Asst. to Atty. Gen., for defendant.

RICE, Chief Judge.

### Findings of Fact

**1.**

This is a suit by Rio Farms, Inc., to recover the capital stock taxes paid pursuant to Section 1200(a) of the Internal Revenue Code, 26 U.S.C.A. § 1200(a), together with interest on the sums hereafter found from November 18, 1947, the years involved being 1942, 1943, 1944, and 1945. It was stipulated by the parties, and I so find, that there was no tax for the years 1942 and 1943; that $11,968.08, which is tax plus statutory interest for the year 1944, was paid; that the sum of $12,085.65, which was tax plus statutory interest for the year 1945, was paid.

**2.**

The Court has jurisdiction of this cause under the laws of the United States, and more particularly under 28 U.S.C. § 1340.

**3.**

On 1 May, 1941, American United Life Insurance Company, the Receiver of American Life Insurance Company, and the Commissioner of Insurance of the State of Michigan, and Permanent Liquidating Receiver of American Life Insurance Company, executed to the United States of America an exclusive and irrevocable option and right to purchase 25,949.795 acres of land, more or less, lying, situated, and being in Hidalgo and Willacy Counties, Texas, more particularly described in said option agreement, 1917.26 acres of which were covered by or involved in certain easements theretofore granted, at a price of Nine Hundred Fifty-Nine Thousand Dollars ($959,000) in cash, upon the terms and conditions in said option contained, which option is in the record hereof.

#### 4.

Upon the stipulation of the parties I find that the United States of America had an option from the same parties listed in the preceding paragraph covering what is known in this record as the Club House property, together with the improvements thereon, for the sum of Twenty Thousand Dollars ($20,000), said option being dated 1 May, 1941, upon the same terms as the option described in the preceding Finding.

#### 5.

The foregoing two options were obtained by the Department of Agriculture of the United States of America through its authorized agency Farm Security Administration.

#### 6.

The F. S. A. (Farm Security Administration) was an agency of the United States of America, a part of the Department of Agriculture, and under the general control and direction of the Secretary of Agriculture, created, among other purposes, to administer and execute the national policy then obtaining at all times material herein, of rural resettlement and rehabilitation.

#### 7.

The options described in paragraphs numbered 3 and 4 herein were taken in the name of the United States of America by the F. S. A.

#### 8.

The lands covered by the options had a main contiguous body of land, but a substantial amount of said lands were in scattered tracts widely separated from the main body of the land, some of said parcels, or tracts, being a great many miles distant from the main body. By the terms of the options, the F. S. A. was obligated to take all or none of the lands covered by said options.

#### 9.

The options being about to expire, the F. S. A. decided that the preferable way to take advantage of the options would be to organize a corporation for such purpose.

#### 10.

In 1941 the F. S. A. conducted an exhaustive and detailed examination of the lands covered by the options, identified in this record as "Rio Farms, Inc., Economic Justification" to determine the actual and potential characteristics of the lands and probable income which could reasonably be expected from crops to be produced thereon, the value thereof and all such allied questions to determine the advisability of the project and whether or not a sufficient return could be expected which would demonstrate that the United States would be able to secure repayment of loan which F. S. A. contemplated making the corporation which it would organize covering the purchase price of such lands. This study was submitted to the officials of the F. S. A. (later known as Farmers' Home Administration) both in the Regional Offices in Dallas and in Washington; the Regional Attorney of the F. S. A. located at Dallas, after full and detailed consideration issued an official opinion finding the Rio Farms, Inc. project to be wholly valid and legal, the Administrator of the Farm Home Administration, later the successor to F. S. A., and the F. S. A. officials personally took the file to the Secretary of Agriculture and secured approval of the project in the later part of 1941.

#### 11.

A draft of a proposed charter and by-laws conformable thereto were prepared in Washington, D. C. in the office of the Department of Agriculture and the F. S. A., and thereupon sent to William F. Farrell, Regional Attorney in the office of the Solicitor, Department of Agriculture, in Dallas, Texas, with instructions to present and file the same with the Secretary of State of the State of Texas.

#### 12.

Mr. Farrell and Mr. Lee P. Pierson, a departmental attorney under Mr. Farrell, presented the Washington F. S. A. draft to the Secretary of State of Texas on December 6, 1941, but the Secretary of State declined to file this draft because of provisions of the laws of Texas. This draft had been prepared by the F. S. A. and the Department of Agriculture in Washington with the idea of making the corporation to be formed a cooperative one within certain

of the policies then being generally followed by F. S. A.

**13.**

Messrs. Farrell and Pierson then consulted with Secretary of the State of Texas, fully stating the purposes and aims for which F. S. A. intended to organize Rio Farms, and it was decided that Subdivision 2 of Article 1302 of the Revised Civil Statutes of Texas specified the correct corporate purpose for the organization of Rio Farms, Inc., and Mr. Farrell, with authority from his superiors and officials of the F. S. A. in Washington, prepared the charter of Rio Farms, Inc., which was executed and subscribed on 6 December, 1941, filed in the office of the Secretary of State of the State of Texas, and approved by the State of Texas on 8 December, 1941, and marked "Exempt".

**14.**

The Charter of plaintiff as filed and approved provides, among other things:

(a) In Article II: "This Corporation, which is formed under Article 1302(2) of the Revised Civil Statutes of Texas, is organized for charitable and benevolent purposes, and in furtherance of such purpose, to meet the social problems and assist low-income farm families and individuals within certain areas within the State of Texas, assisting said families and individuals in obtaining agricultural benefits, marketing and otherwise, and in improving their economic position."

(b) In Article V it is provided: "The number of Directors shall be seven (7) * * * and said Directors shall have the power to select their successors and make such By-Laws as shall be necessary to govern this Corporation."

(c) In Article VI it is provided: "This Corporation shall have no capital stock, and any profit shall be used to further the charitable and benevolent purposes for which it is created, and said Corporation owns no property of any kind."

**15.**

All three incorporators, four of the seven original directors, and all original supervisory personnel, including the present General Manager, were employees of F. S. A., and one of the other three directors was on the Advisory Committee of F. S. A. Incorporators and the five directors became so upon orders of F. S. A., and remained as F. S. A. employees upon the F. S. A. payrolls upon the same orders, thereby securing and assuring complete domination and control of the plaintiff corporation by F. S. A. The supervisory personnel remaining with plaintiff subsequently severed their F. S. A. connections.

**16.**

Pursuant to orders and instructions from both the Dallas and the Washington offices of F. S. A., F. S. A. attorneys Farrell and Pierson held the organization meeting of Rio Farms, Inc., at Edcouch, Texas, on 9 December, 1941. This meeting was held in the presence of F. S. A. employees, some of whom were the incorporators and directors.

**17.**

Ted Watson, one of the incorporators, was elected President, and Jefferson D. Reagan, one of the original directors, was elected Secretary-Treasurer; both were F. S. A. employees, and after their election as officers continued upon the F. S. A. payroll as F. S. A. employees.

**18.**

At the organization meeting, pursuant to instructions from the Washington and Dallas offices of F. S. A., Mr. Farrell, with the assistance of the other F. S. A. employees present, had the By-Laws which had been prepared by Washington officials of F. S. A. as conformable to the draft of Charter which the State of Texas declined to file, adopted at such organization meeting.

**19.**

The original By-Laws adopted in the manner set forth in the preceding Finding provided for rigid and complete control of plaintiff corporation by F. S. A. Plaintiff was not authorized or permitted to take any action except upon prior approval and direction by F. S. A. The original By-Laws conflicted with charter provisions, but such conflict was not realized by F. S. A. at the

time of the organization meeting, though the conflict was thereafter recognized.

20.

Article IV of the By-Laws specified: "The purpose for which this corporation is formed is to meet the social problems arising from the displacement of low-income farm families and individuals within certain areas within the State of Texas, assisting said families and individuals in obtaining agricultural benefits, marketing and otherwise, and in improving their economic position."

21.

Typical of the By-Law provisions which had the dual effect and purpose of establishing and maintaining complete domination and control of the plaintiff by F. S. A., and which also were in conflict with the terms of the corporate charter, which charter was and is fundamentally an obligation upon said corporation, with the following:

(a) Section 2 of Article III provided for "members", and provided that any member of the corporation could be removed at any time, with or without cause, by the Farm Security Administrator, who could also appoint a new member to fill the vacancy.

(b) Article IX provided: "The annual net earnings of the Corporation shall be retained in the business or distributed as directed by the Administrator of the Farm Security Administration of the United States Department of Agriculture."

(c) Article X provided for amendment of the By-Laws, but stipulated that any such amendment must first be approved by the Farm Security Administrator.

These provisions conflicted with Article V of the Charter which gave the Directors the authority to "make such By-Laws as shall be necessary to govern this Corporation" and Article VI which provided that the Corporation should have no capital stock, and that any profit should be used to further charitable and benevolent purposes, for which the Corporation was created.

22.

At the organization meeting on December 8, 1941, and pursuant to proper authority therefor, United States of America acting by and through the Director of the Resettlement Division of the Farm Security Administration assigned to plaintiff corporation the options described in Findings 3 and 4 above.

23.

It was the purpose and intent of F. S. A. in the organization of the plaintiff Corporation to assign such options to Rio Farms, Inc., and to loan to Rio Farms the money necessary to purchase the lands covered by said options, and the assignments of said options, each and both, recited that Rio Farms, Inc. "has applied for a loan" for the purpose of purchasing and that such loan had been approved by the assignor, United States of America.

24.

After approval by the Secretary of Agriculture and pursuant to proper authority, United States of America, acting through the Farm Security Administration loaned to Rio Farms, Inc., the sum of One Million Twenty-Nine Thousand Dollars ($1,029,-000) to purchase the lands covered by the options; thereafter, pursuant to the same authority and on 30 September, 1942, United States of America, acting by and through the F. S. A. loaned an additional sum of Two Hundred Two Thousand, Three Hundred Fifty and no/100 Dollars ($202,350) for operating capital, purchase of equipment, etc., and thereafter on 3 July, 1942, borrowed an additional sum of Thirty-five Thousand Dollars ($35,000). All three loans were evidenced by notes secured by deeds of trust upon the property bought by plaintiff corporation pursuant to the options assigned to it by the United States of America.

25.

Contemporaneously with the making of the loan, plaintiff executed on 31 December, 1941, a loan agreement to the United States of America covering loan for $1,020,-000; and thereafter on 30 September, 1942, made a supplemental loan agreement covering the second loan of $202,350. Both loan agreements were identical in terms. The first was executed for the United States of America by the Acting Regional Direc-

tor, Region 8, of the F. S. A., and on behalf of Rio Farms, Inc., by two F. S. A. employees: Ted Watson, acting as President of Rio Farms, Inc. and Jefferson B. Reagan, acting as Secretary-Treasurer. The supplemental loan agreement was executed for the United States by W. A. Cannon, the Regional Director of Region VIII, Farm Security Administration. W. A. Cannon was present at the organization meeting of Rio Farms, Inc., and supervised, directed and controlled the plaintiff company under the terms and conditions of the loan agreements and under the provisions of the original By-Laws, which gave F. S. A. complete control of Rio Farms, Inc.

26.

Article V of the loan agreement provided the loan should be used for the following purposes: "For charitable and benevolent purposes, and in furtherance of such purpose, to meet the social problems and assist low-income farm families and individuals within certain areas within the State of Texas, assisting said families and individuals in obtaining agricultural benefits, marketing and otherwise, and in improving their economic position."

The quoted language in the loan agreement is taken from and is identical with the language in the Purpose Clause of the Charter of the plaintiff.

27.

The following provisions of the loan agreements deprived the plaintiff corporation of the independent right to manage its own affairs and place the F. S. A. in control of the management, policies, and operation of the plaintiff corporation. Section VI headed "Conditions" provided that so long as any portion of the debt remained unpaid, plaintiff corporation, inter alia, agreed:

"(a) Unless otherwise authorized in writing to keep the proceeds of the loan, together with all monies coming into its possession on deposit or in trust with Government designated banks, such funds and securities to be withdrawn and disbursed only upon countersignature of such person or persons as the Government might from time to time designate or appoint, provided that if the Government should appoint a supervisor, the supervisor should sign in lieu of any officials of the plaintiff corporation.

"(e) It will preserve and maintain its present provisions with respect to membership. fees, elegibility and admission of members and participation of members in its affairs, management and benefits, as set forth in its charter and By-Laws, unless written permission to change such provisions be first obtained from the Government.

"(g) It will keep all its books and records in such form as the Government may prescribe or approve and at all times open to the inspection and examination of the Government, and will permit copies thereof to be made by the Government.

"(h) It will not borrow funds from any sources or for any purpose, nor contract any liabilities of any other kind except current liabilities in the regular course of business, nor enter into any contracts other than in the regular course of business, nor extend credit in any amount, nor declare or distribute any dividends or patronage refunds without the written approval of the Government.

"(1) It will conduct and manage its affairs in accordance with such policies as the Government may from time to time prescribe and deem necessary for the protection of its interests hereunder. It will employ as general manager such person and at such salary as may from time to time be designated in writing by the Government and will discharge such manager upon the request of the Government, but will not discharge such manager without the written consent of the Government.

"(m) It will comply with such standards respecting collective bargaining, child labor, hours of labor, conditions of employment and wages of its employees and of the employees of the individuals, partnerships, associations and corporations which may deal with the Borrower, as the Government may from time to time prescribe. * * *"

Section VII, headed "Appointment of Supervisor", provides that if the plaintiff

corporation fails to comply with any of the terms and conditions of the loan agreement, the Government was authorized to appoint a supervisor at such salary as it might fix at the expense of the plaintiff corporation, such supervisor, when appointed, should become "irrevocably the sole lawful attorney and manager of the Borrower and shall have the power, for and in the name of the Borrower, to manage and operate its business and property and to do any and all acts and things necessary or proper for the exercise of said power in as full and ample a manner as the Borrower itself might do", giving to the supervisor the further power should he be appointed, to hire, fire, appoint, and remove, fix the duties and salaries of all employees, agents, servants, and attorneys of the plaintiff corporation, and otherwise to exercise all rights and powers permitted by the loan agreement.

### 28.

Under the powers provided in Section VI of the loan agreements set out in the preceding finding, W. A. Cannon, Assistant Regional Director of F. S. A., exercised for F. S. A. supervision of the "whole project", and exercised the powers granted by Section VI either himself or through designated assistants.

### 29.

F. S. A. exercised the control and domination of the plaintiff corporation under the powers given it by the loan agreements until 7 February, 1945, on which date final payment was made on the three notes to F. S. A. and the notes cancelled, the deeds of trust having been formally released by instrument dated 20 January, 1945.

### 30.

At a special meeting of the Board of Directors of plaintiff corporation on June 10, 1942, the By-Laws were completely re-written and a draft prepared by F. S. A. attorney Farrell. Article IV reiterated the corporate purpose under Article 1302(2) of the Revised Civil Statutes of Texas, and quoted the charter purpose. Article V again provided for membership of the plaintiff corporation, limiting members to low-income farmers holding land tenure contracts, either lease or purchase, and in Article XII providing that at the end of each fiscal year: "The Board of Directors shall cause to be computed the net earned surplus of the corporation after deducting any accumulated deficits at the end of the preceding fiscal year. The Board of Directors shall then distribute the net earned surplus on the books of the corporation as retained refunds to the credit of each individual member in their proportion which the total amount of the purchases of goods and services from and sales to the corporation for said fiscal year bears to the total amount of goods and services from the sales to the corporation by all the members for said fiscal year."

Said By-Laws as further amended provided for a Board of Directors to be elected by the members. At the time the F. S. A. prepared and required the adoption of these amended By-Laws, it did not realize the conflict between such By-Laws and the charter of the plaintiff corporation.

### 31.

The plaintiff corporation had no net earnings in the year 1942, and the year 1943 was the first year in which the plaintiff corporation had any net earnings. When the F. S. A. realized that the plaintiff corporation would have net earnings for the year 1943, it then discovered the conflict between the By-Laws and the charter provision which required any profits to be used to further the purposes for which the corporation was created. Accordingly on August 16, 1943, and before the end of the fisal year under which the plaintiff corporation operated, the F. S. A. had the By-Laws amended in several respects, of which the following only are listed as bearing particularly upon the issues here:

(a) Section 2 of Article VII provided that five of the seven directors should be elected from members of the corporation, and the other two should be non-member directors. This continued to violate the charter provision providing that directors should elect their own successors.

(b) Article XII which had required the distribution of "net earned surplus" among members was stricken in its entirety and there was substituted for it the following: "The corporation's annual net earnings shall be retained and used in furtherance of the purposes of the Corporation." which was in accordance with the charter requirement.

(c) Later, on September 28, 1943, further amendments were made to the By-Laws to eliminate any reference to the plaintiff corporation being a cooperative "for the reason that the Corporation is not a co-operative organization".

### 32.

These amendments and changes in the By-Laws were not made in contemplation of a claim of tax exemption of the plaintiff corporation, but were made upon discovery by the Regional Attorney of the F. S. A., William F. Farrell, of the conflict with the charter provisions and after submission to and clearance with the Administrator of the Farm Security Administration, the associate solicitor of United States Department of Agriculture, and the attorney for the plaintiff corporation which the plaintiff corporation had by that time secured. Prior to these amendments the F. S. A. had realized that there could not be a distribution of patronage dividends or of any portion of any net earnings under the plaintiff corporation's charter, but when it developed for the first time that the plaintiff corporation would have net earnings in the fiscal year ending August 31, 1943, the F. S. A. moved to meet the dead line of that date by the amendment of the By-Laws in August, 1943, to prevent any distribution of funds, earnings, etc., contrary to the charter provision.

### 33.

No profits, earnings, net earnings, patronage dividends, or other dividends, were ever paid by the plaintiff corporation to any of the so-called members of such corporation, or to any other person or persons, but all earnings, net earnings, and profits were used to further the charitable and educational purposes for which the plaintiff corporation was created, and to meet its purposes as set forth in Article 2 of its charter.

### 34.

In March, 1944, the Board of Directors of the plaintiff corporation, pursuant to the requirement of the F. S. A. adopted a procedure prepared by F. S. A. for the sale of farm units, created out of its corpus, to tenants at an appraised purchase price or sale value fixed by F. S. A. and plaintiff based upon the average earning capacity of each particular unit in an average year, capitalized in accordance with the basic philosophy of the Bankhead-Jones Farm Tenant Law of the United States. Sales of six units were made to tenants selected and approved by the F. S. A. Four of such contracts have been paid off entirely. The remaining two still have a balance due, but were not in default at the time of the trial of this cause.

### 35.

In addition to the six sales to the six tenant-members belonging to the class of beneficiaries, the plaintiff corporation at the direction and with the approval of the F. S. A. made two other classes of sales which effected the conservation, preservation and protection of the corpus of the property, and which rendered such corpus useful and productive in furtherance of the charter purposes of the plaintiff corporation:

(a) Outlying, scattered tracts, some of them located as much as 30 miles from the plaintiff corporation's headquarters, all lands of the plaintiff east of Lasara, Texas, and the townsite lots in Lasara and Hargill, Texas, and the clubhouse tract, were sold at inflated values then existing and the proceeds used to clear brush from the remaining lands, extend irrigation facilities, and otherwise render them subject to take an active part in the program of the plaintiff corporation for the carrying out and the performance of its charter purposes.

Some of the more important reasons for the sale of such lands were:

(1) The objections raised in the original F. S. A. purchase analysis of the cost and difficulty of administration of such outlying

tracts not contiguous to the main body of the land, and constituting a "fringe" which did not make for efficient organization.

(2) Many of the outlying tracts were too small to constitute the minimum tenant unit devised for those called tenants who belonged to the class of beneficiaries of the plaintiff corporation.

(3) Lands covered with brush located inside the irrigation district cost as much in irrigation taxes to carry as cultivated land.

(4). The proceeds of such sales could be used for clearing brush lands in the lands remaining, which lands, when cleared, could be put into the war effort of producing food, a program then being strongly pushed by the United States Government.

Such lands were sold to miscellaneous parties and the proceeds were used to clear remaining lands of brush to render them subject to and fit for cultivation, and in some instances to extend and make available irrigation facilities. These sales conserved and protected the corpus of the estate of the plaintiff corporation, and permitted it to extend and enlarge its program, all in furtherance of its charter purposes.

(b) The inflated value of lands in the Rio Grande Valley, which made the sales in paragraph (a) hereof worthwhile, continued into 1944, and the Board of Directors of the plaintiff corporation to protect the corpus voted to appraise and sell approximately 3476.61 gross acres at its fair value to raise sufficient funds to liquidate the debt to the United States of America. The F. S. A. was eager and anxious that such sale should be made and its debt repaid. Following considerable negotiation between the Board of Directors of the plaintiff corporation and the officials of F. S. A. in its Dallas and Washington offices, a procedure agreeable to both sides was worked out for the sale of such lands which could be had without disturbing or prejudicing the main contiguous body of land owned by the plaintiff corporation adaptable to economical, efficient administration and operation, for executing, furthering, and carrying out the charter purposes of the Rio Farms, Inc. The issues here do not require the detailing of such procedure, except that it contemplated a joint appraisal of the fair value of such lands to be made by F. S. A. representative and a representative of Rio Farms, Inc. This appraisal was made, and to the appraised value of each tract the plaintiff corporation added, in every instance, a certain amount to the end that if the United States of America should execute partial releases they should be executed on the added value, which would thus always give a protective margin to the United States of America between the appraised value and the release value.

After F. S. A. had indicated its approval of such sale, and while the negotiations between the plaintiff corporation and the F. S. A. were going on to determine the governing procedure for such sales, the plaintiff corporation contacted Bentsen Brothers for possible sale, and these negotiations resulted in a contract between Bentsen Brothers and the Rio Farms, Inc., wherein Bentsen Brothers agreed to organize a corporation known as the Monte Alto Land Company, and further agreed that one-half of its capital stock would be donated to the plaintiff corporation. It was then agreed that the Monte Alto Land Company would contract to buy the lands from Rio Farms, Inc. for a purchase price of Five Hundred Thousand Dollars ($500,-000). It was further agreed that if Monte Alto Land Company resold any of such lands at a profit the plaintiff corporation, by virtue of owning one-half of the capital stock of Monte Alto Land Company, would receive one-half of such profits. Pursuant to legal advice, the plaintiff corporation decided against the carrying out of that transaction, whereupon Bentsen Brothers offered to take an assignment of the Monte Alto Land Company contract and stock if the plaintiff corporation would add an additional 1700 acres, the purchase price to be raised from $500,000 to $607,220. Plaintiff accepted this, and the sale was so made. The total lands finally sold by this arrangement amounted to 5,220 acres.

This sale was consummated in February, 1945, and on February 7, 1945, the three notes of the United States of America were

paid, the deed of trust liens released, the loan agreements between the plaintiff corporation and United States of America expired, and the plaintiff corporation, for the first time, was in full and independent charge and control of its acts.

### 36.

The purchasers of the six tenant sales belonged to the class of low-income farm families and individuals constituting the class of beneficiaries of the plaintiff corporation, and such sales in the way and manner and upon the terms of such sales, constituted one of the permissible ways within which the plaintiff corporation could meet its charter purpose.

### 37.

In making the sales of scattered and outlying tracts to raise funds, to clear brush lands, and in making the sales of the lands sold to raise the money to liquidate the debt to United States of America, the plaintiff corporation was not in the business of selling lands in the usual course of business, nor was it holding itself out as a dealer in realty, but was in the performance of a duty required by the law and the good faith discharge of its trust created by its charter purposes and in the good faith discharge of its duties to the class of beneficiaries of said corporation by preserving and conserving the corpus of its estate, thus establishing and insuring the unrestricted discharge of its charter purposes.

### 38.

Upon advice of its legal advisors, the F. S. A. instructed the plaintiff corporation to develop marketing facilities for the assistance and aid of its beneficiaries. It was the F. S. A. opinion that the plaintiff could not itself go into the marketing cooperative business, but that it could create other corporate cooperative marketing associations for the benefit of its beneficiaries, and could lend its credit to the establishment, creation and operation of such cooperatives.

### 39.

During the applicable years here involved there was a chaotic situation in the Rio Grande Valley with respect to vegetable marketing and the individual or small grower was in a disadvantageous position.

### 40.

The charter purpose "in obtaining agricultural benefits, marketing and otherwise, and in improving their economic position" clearly authorizes and empowers the plaintiff corporation to use its monies, credit, and income to assist the class of its beneficiaries and in training them in obtaining advantageous marketing of the products raised; such activity was strictly in furtherance of the charter purposes of the plaintiff corporation. To assist low-income farm families and individuals by teaching them the most approved and efficient means, methods and practices of soil protection and conservation, and crop production, would be valueless and would not be any real assistance unless such individuals were also trained in the most advantageous manner and method of the sale and marketing of such products.

### 41.

Under this policy the plaintiff corporation encouraged and assisted the formation of three cooperatives:

(a) An informal cooperative for the marketing of green-wrapped tomatoes in the spring of 1943, about 95% of the members of this informal cooperative being tenants, and about 5% non-tenants. The monies the plaintiff corporation loaned for the organization of this cooperative were fully repaid, and at the end of the season the savings which resulted from the cooperative marketing action were prorated to the growers who participated in such cooperative on a prorata basis and in proportion to the business done.

(b) The second cooperative was known as the Mid-Valley Farmers Cooperative for marketing vegetables. It operated from 1944 into 1947. The plaintiff corporation loaned this cooperative approximately $160,000, taking security for such loans. The Mid-Valley Farmers Cooperative became defunct, but assigned all of its assets to the plaintiff corporation for application

on the debt. The plaintiff corporation suffered a net loss of approximately $28,000.

83% of the members of the Mid-Valley Farmers Cooperative were tenants of the plaintiff corporation, and the balance were non-tenants.

Because the tenants of the plaintiff corporation were low-income farmers, unable to properly finance the cooperative, it was necessary for the plaintiff corporation to loan and advance money in order to discharge its corporate purposes. This record shows that the Federal Government Bank of Cooperatives will not loan to cooperatives except upon a down payment of about 40%. This the low-income farmers who were tenants of the plaintiff corporation could not do. The loan was made at 3% interest, the same rate of interest charged, according to the record, by the Houston Bank of Cooperatives.

(c) The third cooperative was the Monte Alto Citrus Association, organized in 1945 and still in existence. All monies loaned by the plaintiff corporation to this cooperative have been repaid in full.

(d) The activities and participation of the plaintiff corporation in the creation and organization of the cooperatives herein detailed by various loans made, was a proper and valid activity in furtherance of its charter purposes and in the discharge of its trust to its beneficiaries.

### 42.

A prospective tenant wishing to enter the plaintiff's program fills out an application form, giving information as to the number of his family, where he lives, how long he has been farming, his past experience in farming, information as to his economic status. This application and the information contained is checked for the purpose of identifying the applicant as a member of the class of beneficiaries for which the plaintiff was chartered. Upon acceptance the applicant is given a year's lease as a trial period. The plaintiff's program for both farm and home is fully explained to the applicant and his family, what the program is, their obligation thereto, what the plaintiff will provide and do in the way of education, etc. If the trial period is satisfactory, the tenant is then given a four-year lease.

Counsel, assistance, and supervision is given to educate the applicant and his family in the establishment and carrying out of a sound farm and home plan. Under this educational plan the farmer selects his goal with respect to crops and live stock, and plaintiff advises, demonstrates, and teaches the best practices and procedures to be used and followed in reaching those goals, including teachings on diversification and balanced planning, and also proper care, feeding, etc., of live stock. Information, demonstration and guidance on pasture improvement work, soil, and all agricultural activities are given. Group meetings, field demonstrations, visual educational programs, discussions and lectures on timely agricultural subjects, are held throughout the year. The applicant is given information, advice and guidance with respect to insecticides.

All field days, demonstrations, lectures, meetings, visual educational programs, etc., are open generally to farmers, agricultural workers, and the public, and this record shows that there has been wide attendance and interest generally throughout the community of the Rio Grande Valley.

### 43.

To assist the program covered in the preceding Finding, plaintiff corporation set up in 1942 an experimental and demonstration work which grew steadily and was finally confined to a particular area, beginning in 1945. Here, demonstration and experimental research was done to solve all agricultural problems confronting the plaintiff's tenants; the identification and proper cultivation of new crops adaptable to the Rio Grande Valley, the development of new practices, as well as the improvement of existing practices to increase the crop output, as well as to protect and restore the lands.

This program has been excellent, and has been of wide interest and influence, not only to the plaintiff's tenants but to the entire community of the Rio Grande Valley, with the result that not only have the tenants and farmers and persons of agri-

cultural interests all over the Rio Grande Valley come in to learn from the experimental and demonstration work, but such organizations as Four-H Clubs, various agricultural parties, and students from various agricultural schools have come in to observe and learn from such activity. Several new crops and agricultural products have been developed of great interest and value to the plaintiff's beneficiaries as well as to the general agricultural community of the Rio Grande Valley, and the value of this has extended on a national scope in research carried on during the war with the United States of America for the development of guayule as a source of rubber.

### 44.

Each of the units for the tenants of plaintiff corporation used in the program had a comfortable and pleasant house in which the tenants and his family could live, together with necessary outhouses usual and customary to a farm. Between 1942 and 1945 it was not possible to build new houses because of the war, but those houses already situated on the land were improved as best they could be with the materials obtainable, certain pre-fabricated houses were acquired and moved on to the property, and beginning early in 1945 construction of new, modern up-to-date farm houses was begun on the units.

### 45.

The plaintiff charges its tenants the customary share rent on crops, furnishing its proportionate part of all fertilizer and insecticides used by the tenant. This not only tended to develop the farmer's mental and economic outlook, it helped to defray the cost and expenses of operation. Certain services were furnished at cost, such as seed and veterinarians, and certain heavy equipment was purchased and kept by the plaintiff and loaned without charge to its tenants.

Upon graduation the plaintiff helped its graduate tenants find farms, some for rental and some for purchase. The record in this respect indicated many advantages to such graduate tenants. Almost without exception, the economic level of all tenants was raised, most substantially in those cases when the tenants took better advantage of plaintiff's program. One such tenant was a witness, and his record of achievements, his purchase of his own farm, and the benefits he received, as described by him, were impressive.

### 46.

During the applicable years, some of the plaintiff's lands were unimproved, or had insufficient facilities, and therefore were not susceptible or adaptable to the unit plan for tenants to be selected from the class of beneficiaries for which plaintiff was chartered. These lands, at the direction of F. S. A. were rented to others than low-income farmers at the usual rentals obtaining, and the proceeds applied to the maintenance and operation of the program in furtherance of its charter purposes

### 47.

Certain of the lands of plaintiff were dedicated to citrus growth, and these lands were not included in any farm units for tenants, but were run and operated by plaintiff and the income, devoted to the costs and expenses of the entire operation, including the experimental and research work. Other lands having citrus were included in units for rental to its beneficiaries, and they were instructed and trained in the care and cultivation of citrus trees. This was fully authorized, being in furtherance of the charter purposes of the plaintiff.

### 48.

The record shows that the plaintiff made certain contributions to charitable and benevolent organizations, as well as contributions in furtherance of agricultural purposes and activities. These were not only in furtherance of its chartered purposes, but were expressly authorized by the laws of the State of Texas under which the plaintiff was chartered.

### 49.

Plaintiff has never had any capital stock, and it has never divided or distributed profits, money, or income accruing to it

to any of its tenants, or to any of the so-called members, or to any other individuals. All net income and profits have been used to further the charitable and educational purposes for which the plaintiff was created and chartered.

50.

On January 19, 1946, the State of Texas filed a "quo warranto" against the plaintiff and the individuals composing its Board of Directors at that time. The State of Texas alleged that the charter had been violated in large measure by acts the same or similar to those in issue here. The State sought cancelation of the charter. Upon trial the District Court declined to cancel the charter, held that the plaintiff was a charitable organization, and that the class of its beneficiaries existed in sufficient numbers as to be available for the receipt of the benefits of the charity for which the plaintiff was organized to dispense. That Court further held that the Board of Directors was illegal, in that it was selected contrary to the charter provisions, and appointed a Board of Directors. That Board of Directors, or the successors selected by those Directors, constituted the Board of Directors at the time of the trial of this cause. Following the judgment, that Board adopted as the policy of the plaintiff that it would sell no further of its lands to tenants or to any of its beneficiaries, but that the corpus of its estate would be held together, preserved and protected to be used as demonstration and educational foundation for the meeting of its charter purposes with respect to low-income farmers, their improvements, rehabilitation, and education. The judgment of the District Court was not appealed.

51.

A group of dissident tenants, or former tenants, sought to intervene in the suit covered in the preceding finding, contending they had been promised the right to purchase tracts of land, and seeking to compel the plaintiff to sell such tracts to them. Their intervention was severed out of the suit brought by the State, and styled "Clevenger vs. Rio Farms". The District Court in that case held that such dissident tenants were not entitled to enforce charitable trusts for their own benefit, nor to enforce an oral agreement to sell land, and further held that the plaintiff could execute the trust of its charter purposes in any way ordered or decided by its Board of Directors, and might sell to those in the class of its beneficiaries, but could not be compelled to do so. This judgment was affirmed by the Court of Civil Appeals of Texas in an opinion reported in Clevenger v. Rio Farms, 204 S.W.2d at page 40. Writ of Error was refused by the Supreme Court of Texas, with the notation of no reversible error.

52.

All of the tenants signing the lease contracts of the plaintiff corporation and entering the plaintiff corporation's program during the applicable years involved here belonged to the class of beneficiaries of the plaintiff, and were low-income farm families or individuals.

53.

On November 4, 1943, the Commissioner of Internal Revenue held that Rio Farms, Inc., was not exempt under Section 101(6) of the Internal Revenue Code, 26 U.S.C.A. § 101(6), but was entitled to have its claim to an exempt status considered under Section 101(12) of the Internal Revenue Code.

On October 30, 1943, Treasury Department Form 1023, being a questionnaire for religious, charitable, scientific, literary or educational organizations claiming exemption under Section 101(6) of the Internal Revenue Code was filed with the Bureau of Internal Revenue by plaintiff.

The source of the plaintiff's income was stated to be from "sale of land and proceeds of crops produced thereon", and its activities were described to be: "Locate low-income farmers as home owners on economical farm units. All other activities incident to holding and maintaining land are subordinated to the principal objective."

The expenditures of its funds was described as: "Contributing to raising the economical and social standard of low-

income farmers in this area and payment of purchase price of lands acquired by the corporation."

On January 15, 1944, the Commissioner of Internal Revenue on the basis of evidence submitted held plaintiff could not qualify for exemption under Section 101 (6), but granted exemption under the provisions of Section 101(8) of the Internal Revenue Code, which also released it from any obligation to file capital stock tax returns for future years, so long as the exemption from income tax was effective, and requiring it to file Treasury Department Form 990, being an Annual Return of Organization Exempt from Income Tax under Section 101(1) of the Internal Revenue Code, or under corresponding · provisions of prior revenue acts.

### 54.

Plaintiff filed its capital stock tax return for the year ended June 30, 1944, declaring the value of its capital stock, and claiming exemption from taxation under Section 101. Similar action was taken with respect to capital stock tax return for the year ending June 30, 1945.

### 55.

On October 3, 1946, the Commissioner of Internal Revenue wrote the plaintiff setting forth reasons why the Commissioner thought it was not operated in the manner provided by its Articles of Incorporation, cancelling and recalling the letter of January 15, 1944, granting exemption under Section 101(8) of Internal Revenue Code, setting up as its reasons issues tried in this cause found by these findings against the Commissioner's letter and in favor of the plaintiff.

### 56.

On March 9, 1949 Plaintiff filed a claim for refund of the sum of $11,968.08 (tax of $10,021.25 plus interest) which has been paid in capital stock taxes for the year ended June 30, 1944, together with interest thereon, and a similar claim for refund in the sum of $12,085.65 (tax of $10,655 plus interest) which had been paid in capital stock taxes for the year ended June 30, 1945, together with interest thereon. These claims for refund were rejected by the Commissioner of Internal Revenue on April 15, 1945, whereupon plaintiff instituted this action.

### 57.

This record shows that during the period in question the plaintiff was a corporation organized and operated exclusively for charitable, scientific and educational purposes, no part of the net earnings of which inured to the benefit of any private shareholder or individual, and no substantial part of the activities of which was carrying on propaganda, or otherwise attempting, to influence legislation, and therefore qualified under Section 101(6) of the Code for exemption from capital stock tax, but the claim for refund did not list Section 101(6), and these Findings are not based thereon.

### 58.

During the period in question the record herein shows that plaintiff was an agricultural organization and therefore was entitled to exemption under Section 101(1) of the Internal Revenue Code from such capital stock tax, but since the claim for refund herein did not expressly list Section 101(1) the Findings made herein are not based thereon.

### 59.

During the period in question the record here shows that plaintiff was an organization not organized for profit but operated exclusively for the promotion of social welfare, and therefore was entitled to exemption under Section 101(8) of the Internal Revenue Code from such capital stock tax, which ground was expressly claimed in the claim for refund herein and is entitled to be upheld here.

### 60.

Upon trial hereof both sides offered evidence of the character of the operations, etc., of the plaintiff on and after 1945. While this evidence shows that the nature and character of the plaintiff's operations have not changed since 1945, such evidence is not material to the determination of the issues involved here, and has not been considered by the Court in reaching the decisions here.

Conclusions of Law

1.

I conclude that the plaintiff, Rio Farms, Inc., is entitled to exemption from capital stock tax under Section 101(8) of the Internal Revenue Code, so that defendant was not entitled to demand and receive collection of the capital stock taxes involved herein.

2.

I conclude that plaintiff is entitled to judgment for the sum of $11,968.08 plus the sum of $12,085.65, with interest on each sum from November 18, 1947, and for all costs of suit.

3.

Let judgment be prepared in accordance with these Findings and Conclusions, and presented.