**SCOFIELD, Collector of Internal Revenue, v. RIO FARMS, Inc.**

**No. 14211.**

United States Court of Appeals Fifth Circuit.

June 12, 1953.

Homer R. Miller, Spec. Asst. to the Atty. Gen., Charles S. Lyon, Asst. Atty. Gen., Ellis N. Slack, Acting Asst. Atty. Gen., Bradford F. Miller, Asst. U. S. Atty., San Antonio, Tex., Robert N. Anderson, Spec. Asst. to Atty. Gen., Charles F. Herring, U. S. Atty., San Antonio, Tex., for appellant.

Marvin K. Collie, Houston, Tex. (Vinson, Elkins, Weems & Searls, Houston, Tex., Lauderdale & Bowe, Mercedes, Tex., Thomas Fletcher, Houston, Tex., Henry Lauderdale, Mercedes, Tex., of counsel), for appellee.

Before HUTCHESON, Chief Judge, and BORAH and RUSSELL, Circuit Judges.

HUTCHESON, Chief Judge.

Brought by appellee, plaintiff below, the suit was for refund of capital stock taxes which had been collected from it as due un-

der Sec. 1200(a), I.R.C.[1] for the fiscal years ending June 30, 1944 and 1945.

The claim was that by Section 1201— "Exemptions",[2] plaintiff was exempt from the taxes imposed by Section 1200, in that it was a corporation described and exempted by Sec. 101(8),[3] and that it was additionally exempt by reason of the provisions of Sec. 101(6).[4]

The defense was a denial that plaintiff came under either of the exemptions claimed and that, as to its claim that it is exempt under Sec. 101(6), it filed no claim for refunds on this ground, and it is, therefore, barred from making claim under that section.

The issues thus joined, the cause was tried to a judge without a jury upon voluminous evidence, oral and documentary, and the district judge, gathering and summarizing the material evidence, made detailed findings of fact and conclusions of law, and, based on them, gave judgment for plaintiff. The general effect of these findings and conclusions[5] was that plaintiff, during the period in question was an organization not organized for profit, but operated exclusively for the promotion of social welfare and, therefore, was exempt under Sec. 101(8) of the Internal Revenue Code, the ground expressly asserted in the claim for refund, and is entitled to a judgment for the amount sued for.[6]

Appealing from the judgment entered on these findings and conclusions, the defendant is here insisting that in so finding and holding, on evidence presenting no conflict whatever and completely failing to measure up to the obligation upon plaintiff to show that it was tax exempt, the district judge drew an unpermissible inference that plaintiff was exempt from stock taxes for the years in question. Insisting that this is so for both years, appellant urges upon us that if it is not, it is certainly so for the year ending June 30, 1944, because during a portion of that year the by-laws of the company provided that cash distributions could be made to its members.

Appellee, meeting these contentions with complete confidence, insists (1) that on the undisputed evidence plaintiff was an exempt corporation under Sec. 101(8) in both of the years, and (2) that while it is true that it did have by-laws for a part of the year ending in 1944, which provided for distribu-

1. 26 U.S.C.1946 Ed.Sec. 1200.

2. 26 U.S.C.1946 Ed.Sec. 1201. This section provided: "(a) The taxes imposed by section 1200 shall not apply—(1) to any corporation enumerated in section 101" 26 U.S.C.1946 Ed.

3. "§ 101(8) Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes;"

4. "§ 101(6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation;"

5. Reported in Rio Farms v. Scofield, D. C., 103 F.Supp. 515.

6. While in findings Nos. 57 and 58, the district judge found that the plaintiff was during the period in question a corporation organized and operated exclusively for charitable, educational, and scientific purposes, no part of it inured to the benefit of any private shareholder or individual and was, therefore exempt under Sec. 101(6) and also that it was an agricultural organization and exempt under Sec. 101(1), he found further that since its claim for refund did not list Sec. 101(6) as grounds therefor, his findings and conclusions in plaintiff's favor were not based on these two sections.

He also found, in finding No. 60, that "upon the trial hereof both sides offered evidence of the character of the operations of the plaintiff on and after 1945, and that while the evidence shows that the nature and character of the operations have not changed since 1945, such evidence is not material to the determination of the issues involved herein and has not been considered by the court in reaching the decision here.

tions to its members and for its operation as a cooperative, these by-laws were contrary to the provisions of the charter under which it was organized and were, therefore, void, and, further, no distributions were ever made, and no cooperative action .aken under them.

Because the district judge has correctly summed up and fully and carefully set down the facts in his conclusions of fact and law, reported in 103 F.Supp. 515, it will be unnecessary for us to do more than, referring to these findings with approval, thus summarize those we regard as material here.

In 1941, the Farm Security Administration, hereafter referred to as F. S. A., secured an option executed to the United States of America for the purchase of 26,-000 acres of land located in Hidalgo and Willacy Counties, Texas. The options being about to expire, F. S. A. decided that the preferable way to take advantage of them was to organize a corporation for the purpose.

Thereafter, a charter and by-laws prepared by the Department of Agriculture, with the idea of making the corporation a cooperative within the policy then generally being followed by F. S. A., were presented to the Secretary of State of Texas, and declined because of provisions of state law. Counsel for F. S. A. then consulting the Secretary of State, it was decided that a corporation should be organized under subdivision (2) of Art. 1302 of the Revised Statutes [Vernon's Ann.Civ.St. Art. 1302, subd. 2], and a charter prepared and filed with the Secretary of State was approved by him on Dec. 8, 1941, and marked "Exempt".

The charter provided *inter alia* as follows:

"(a) In Article II:

"This corporation, which is formed under Art. 1302(2) of the Revised Civil Statutes of Texas, is organized for charitable and benevolent purposes, and in furtherance of such purpose, to meet the social problems and assist low-income farm families and individuals within certain areas within the State of Texas, assisting said families and in-dividuals in obtaining agricultural benefits, marketing and otherwise, and in improving their economic position."

"(c) In Article VI it is provided:

"This corporation shall have no capital stock and any profit shall be used to further the charitable and benevolent purposes for which it is created, and said Corporation owns no property of any kind."

All of the incorporators and the directors were employees of F. S. A. Under orders of the F. S. A., an organization meeting was held. At that meeting, by-laws were adopted providing for control of taxpayer by F. S. A.

Article IV of the by-laws followed in general the purpose article of the charter, while Article IX provided that the annual net earnings of the corporation shall be retained in the business or distributed as directed by the Administrator of F. S. A. At that meeting the United States assigned to taxpayer the options on the land, and, after approval by the Secretary of Agriculture, the United States made three loans to the taxpayer to purchase the land and for operating capital. Taxpayer executed loan agreements with the United States, which provided that the loans should be used for the purpose set out in charter and by-laws, and further provided for complete control by F. S. A. until the debt was paid, and F. S. A. exercised such control and domination until February 7, 1945, when final payment was made and the notes were cancelled.

At a special meeting of the Board of Directors held on June 10, 1942, taxpayer's by-laws were completely rewritten by an F. S. A. attorney. These repeated the earlier by-laws, including those confining membership in the taxpayer to low income farmers, but they contained an Article XII, providing that the Board of Directors could distribute the net earnings surplus to the individual members in certain proportions named. As to this by-law, the court found that when F. S. A. prepared this amendment, it did not realize that it conflicted with the charter as it in fact did, since it authorized distributions to the members of the earned profits.

On August 14, 1943, the by-laws were again amended, and Art. XII was stricken entirely. The court found that the by-laws had not been immediately amended because the fiscal year ending August 31, 1943, was the first year in which taxpayer had net earnings. It further found that no profits or dividends of any kind were ever actually paid by the taxpayer to its members or to any other person.

In March, 1944, taxpayer's directors, pursuant to the requirements of F. S. A., adopted a procedure for sale of units to tenants and certain sales were made. In 1944, the directors voted to appraise and sell 3500 acres of land to liquidate the indebtedness to the United States, and this was done. In the year ending August, 1944, the corporation received income from leasing, citrus sales, etc., of over $840,000, and for the year ending August, 1945, of over $900,000. In addition to its other activities, the corporation has helped to organize and has loaned moneys to cooperatives for the furtherance of its program and while it has in the period since it took the options made a considerable amount of money so that its net worth in August, 1948, was nearly $3,000,000, it has not distributed any of the funds but has used them generally for the purposes set out in the charter.

It was defendant's position below, it is its position here: that taxpayer was not a civic league or other organization not organized for profit but operated exclusively for the promotion of social welfare, within the meaning of Sec. 101(8); that, on the contrary, it operated a large farming organization with a selected group of farmers as its beneficiaries and made large profits which accumulated far beyond any need for its stated program for aiding low income farmers in making a livelihood; and that it was clearly not operating exclusively for the promotion of social welfare, within the meaning of the section.

Insisting that, though it did conduct an educational farming program for the benefit of its members, and assisted them to benefit their economic lot in many cases, its operations were clearly not exclusively charitable or educational or conducted sole-ly in the interest of the general public, but comprehended benefits to the members of a single economic group through aiding them in earning a livelihood in agricultural pursuits and by distributing various benefits to them in forms other than cash, appellant urges upon us that appellee is not, in its very nature it cannot be, a corporation exempted under Section 101(8).

In support of this position, it cites and relies on cases such as Consumer-Farmer Milk Cooperative v. Commissioner, 2 Cir., 186 F.2d 68; Better Business Bureau v. United States, 326 U.S. 279, 66 S.Ct. 112, 90 L.Ed. 67; Duffy v. Birmingham, 8 Cir., 190 F.2d 738; Industrial Addition Association v. Commissioner, 6 Cir., 149 F.2d 294; Universal Oil Products Co. v. Campbell, 7 Cir., 181 F.2d 451; and other cases of that type.

Pointing out: that the members of the taxpayer, were its tenants or purchasers of farms from it, all of whom were able bodied men who worked hard, paid the customary rentals, and were not in any sense the recipients of charity; that they went into the community farming project because of the many benefits which they received, good housing, use of heavy machinery, insecticide and fertilizer furnished at reduced rates, veterinarian services at cost and free use of taxpayers water system; appellant scouts the idea that appellee was a civic league operated for the promotion of social welfare and the net earnings of which are devoted exclusively to charitable or educational purposes.

It points out, too, that the cooperative taxpayer members were given a better market for their produce, the tenant farmers received a better deal than the average tenants, and the enterprise must be regarded as one devoted to the economic benefit of a particular class or group of persons and not, as required by Section 101(8), an organization operated exclusively for the promotion of social welfare, the net earnings of which are devoted exclusively to charitable, recreational, or charitable purposes. Among other matters on which appellant relies as demonstration that this is

so is the fact shown in Tables 1 and 2[7] in its brief as to the net worth of the tenants at the beginning and at the end of their tenancies.

The appellee, on its part, puts its reliance in support of the judgment in its favor on that long line of cases which, beginning with Trinidad v. Sagrada, 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458 and Roche's Beach v. Commissioner, 2 Cir., 96 F.2d 776, is followed by cases in this and other circuits such as Koon Kreek Klub v. Thomas, 5 Cir., 108 F.2d 616; Willingham v. Home Oil Mill, 5 Cir., 181 F.2d 9; Squire v. Students Book Corp., 9 Cir., 191 F.2d 1018; C. F. Mueller Co. v. Commissioner, 3 Cir., 190 F.2d 120, where with great uniformity it is declared that in these cases a rule of liberal construction in favor of the exemption claimed applies, and that it is the use made of the profits rather than the source from which they are earned that determines the question of whether the corporation is, or is not, exempt. So relying, appellee insists that this corporation fathered by F. S. A. under a charter of the State of Texas, authorizing its organization for the promotion of social welfare and presenting a uniform record of the use of its funds for the purposes of its organization is, and must be held to be, exempt.

Arguing that the case comes down at last to the question whether the facts that some of the persons who benefit from its use are not really poor persons living substandard lives but are average farmers, and that the corporation is constantly increasing its net worth, are of any real significance, appellee insists that, whatever may be said of the varying decisions in the cases where companies which are engaged in business and make their profits from business, claim to be exempt from tax merely because their profits are payable to exempt charitable organizations,[8] that question is not present in this case, for here all of the profits derived are derived from the doing of the things for which the corporation was organized. None of them are derived from outside business activities.

Upon full consideration of these varying contentions and counter contentions and the authorities cited in favor of and against them, and without in any manner undertaking to determine the tax status or tax exemption of this corporation except as to the corporate tax and the two years in question in this case, we are of the clear opinion that while the question is not entirely free from difficulty, the weight of authority and of reason are with the appellee and the district judge, and that the judgment must be affirmed.

In so holding, we are not insensible to, indeed we are fully mindful of the apparently anomalous position taxwise of this tax exempt corporation which, having raised itself by its boot straps by buying a piece of land and selling a small part of it at a great profit, is engaged in an operation, as a result of which particular individuals, who

7. Table 1

| Net Worth of Tenants at Beginning of Tenancies | Number of tenants |
| --- | --- |
| Less than $2000 | 144 |
| Between $2000 and $5000 | 71 |
| Between $5000 and $10,000 | 32 |
| Over $10,000 | 2 |

Table 2

| Net Worth at End of Tenancies | |
| --- | --- |
| Under $2000 | 34 |
| Between $2000 and $5000 | 52 |
| Between $5000 and $10,000 | 60 |
| Between $10,000 and $15,000 | 21 |
| Between $15,000 and $20,000 | 7 |
| Over $20,000 | 8 |
| Net shown by Plaintiff's Exhibit 100 | 67 |

8. C/f United States v. Community Services, 4 Cir., 189 F.2d 421, where the authorities on both sides are fairly well gathered up, the statute, as amended, in 1950, is set out, and the conclusion is drawn that Judge Hand's dissenting opinion in Roche's Beach, rather than the majority opinion, states the law.

are neither paupers nor otherwise objects of charity, receive great benefits.

We think, though, that the fact that the persons who receive the benefit of its activities are not paupers or people living on a substandard scale, would not any more defeat the claim of this corporation to exemption from the corporate taxes assessed against it than the fact that educational opportunities are availed of by large numbers of people who can afford to pay for them would defeat the exemption of great Universities, Art Galleries, and other non-profit educational institutions. The laws of the United States and of the states have been framed with the idea of promoting such corporations, enterprises, and institutions, rather than turning to the government for the necessary funds. Until then the policy advocated by the Commissioner is made clear by legislation, this court, as it has heretofore indicated in the Koon Kreek Klub and Willingham decisions, is inclined to, and will, continue to follow a liberal, rather than a cheese paring, construction in considering and determining such claims for exemption, as this case presents.

If the Congress wishes to take away the tax exemption accorded by the statute in situations of the kind presented here, it can do it as easily as it did in the 1950 amendment. In it, dealing with organizations operated for the primary purpose of carrying on a trade or business for profit, it provided that such an organization shall not be exempt under any paragraph of this section "on the ground that all of its profits are payable to one or more organizations exempt under this section from taxation."

The House Committee Report, after calling attention to the great amount of litigation arising out of the attempted application of the rule under existing law, declared, "The amendment is intended to show clearly what, from its effective date, the rule is to be without disturbing the determination in present litigation of the rule of existing law." Until Congress amends Section 101 (8) to clearly exclude corporations of the kind dealt with here, we are constrained to hold that appellee was exempt from the stock tax and that the judgment ordering a refund was right and must be

Affirmed.